Norman M. MORRIS, Plaintiff-Appellant,

v.

**FEDERATED MUTUAL INSURANCE COMPANY, Defendant-Appellee.**

No. 73–2669.

United States Court of Appeals,
Fifth Circuit.

July 18, 1974.

Rehearing Denied Aug. 27, 1974.

Joe N. Unger, Miami Beach, Fla., Bennett G. Feldman, Miami, Fla., for plaintiff-appellant.

Joseph F. Jennings, Miami, Fla., for defendant-appellee.

Before BROWN, Chief Judge, and TUTTLE and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Following amicable termination of his employment Morris, a former insurance solicitor employee of Insurer, Federated Mutual Insurance Company, a direct writing company, brought this suit seeking to recover over $12,000.00 in back salary, retirement funds and an amount due on a contract settlement. Insurer counterclaimed alleging that Morris owed the company for losses incurred under policies written without company authorization and chargebacks for commissions paid to Morris on cancelled policies or unpaid premiums. While the parties agreed in a pretrial stipulation that Morris was entitled to back pay and retirement funds worth over $6,000.00,[1] Morris found this amount offset by the District Court's final judgment in favor of Insurer. When the dust had cleared, Morris was not only left with empty pockets, he was indebted to his former employer to the tune of approximately $12,000.00.[2] Concluding that the District Court improperly allowed recovery by Insurer for chargebacks and incurred losses and disallowed renewal contract payments, we reverse.

Morris had worked as a straight commission salesman for Insurer from April 1966, until December 1, 1970.[3] He was a high producer with a gross of a half million in premiums and net commission in the neighborhood of $48,000.00. On December 1, 1970, he began working under a new sales agreement by which he would receive a fixed salary for $17,500.00 plus commissions on new business only. Morris thereafter voluntarily terminated his employment with Federated Mutual on January 31, 1971.

In June 1970 prior to converting over to a salaried employee on December 1,

---

1. The pretrial stipulation, the parties agreed that Insurer owed Morris the following:

| Item | | |
|---|---|---|
| (a) Salary | $1,458.00 | |
| (b) February New Business | 394.00 | |
| (c) Retirement Fund Refund | 5,139.94 | |
| | | $6,991.94 |
| Less: | | |
| (d) January New Business | | −519.00 |
| NET DUE | | $6,472.94 |

In addition, as a disputed item Morris claimed $7,352.00 on the Johnson renewal transfer (see note 6, infra.).

2. Offset items allowed and in dispute on this appeal are:

| Item: | | |
|---|---|---|
| (i) Chargebacks | | |
| (a) Nuway Auto | $ 652.00 | |
| (b) John Mathews Ford | 3,426.00 | |
| | | $ 4,078.00 |
| (ii) Incurred Losses | | |
| (a) Lindy's Restaurant | 12,382.04 | 12,382.04 |
| TOTAL | | $16,460.04 |

◆

3. Morris' employment contract was called a "Salesman Employment Contract" with compensation being commissions on the sale of insurance and renewal of those policies.

Morris at Insurer's behest had contracted with it to transfer all of his existing accounts (commercial and P.I.D.) to a new agent in return for $7,532.00 to be paid over a five year period. This transfer agreement occurred prior to and is separate from his December new employment contract.

### Chargebacks

When Morris assumed his new employment status as a salaried agent he was to receive no further commissions for policies written by him before December 1, 1970. Insurer in its counterclaim contended that while Morris would receive no commissions for his old business Insurer had the right under the new employment contract to deduct from Morris' salary (not just commissions on new business) the appropriate portion of all premiums credited to him prior to December 1, 1970 but which from nonpayment by policy holders, cancellations, etc., were not retained by Insurer. These adjustments are called chargebacks and were standard procedure under Morris' former commission employment contract. Morris disclaims any chargeback liability after December 1, 1970, asserting that under his new employment contract he was to receive neither commissions *nor* chargebacks from policies written *before* December 1, 1970.

The District Court found that appellant owed the appellee over $4,000.00 in chargebacks for returned or unearned premiums arising from business written before December 1 (see Item (i), note 2, supra.). While making no mention of the new employment contract, the District Court, presumably crediting Insurer's evidence as to the intention of the parties, held that the new December 1970 contract did not alter the former requirement of an adjustment.

As with the June 1970 renewal transfer agreement, the conversion by Morris from a commission to a salary contract was not his idea or necessarily to any advantage to him. On the contrary it was initiated by the company in November of 1970 as a part of its high-level management plan to disengage from the sale of unprofitable casualty lines of insurance in the Miami area. Morris' conversion contract was embodied in a "New Sales Agreement" which in letter form merely stated that "[y] our annual salary will be $17,500.00, plus new business commissions . . ." Although this was a written contract, evidence was introduced by both parties undertaking to recite the substance of words spoken in the formulation of the new agreement in an effort to demonstrate what the respective positions of the parties were when the agreement was signed. On this Morris argued that as an integral part of the agreement it was intended that he would not be held liable for chargebacks on old business when he was relinquishing any right to future commissions from his old business. Insurer countered with the contention that it was intended that Morris continue to be bound by the former employment contract and the salary merely paid him for servicing the existing policies (and any renewals) of the discontinued lines of insurance. Thus the new agreement was merely a written modification of the existing contract.

■ The cardinal rule under Florida law for construction of a contract is to ascertain and give effect to the mutual intentions of the parties. Shuford Development Co. v. Crysler Corp., 5 Cir., 1971, 449 F.2d 429, 432; Southern Bell Tel. & Tel. Co. v. Florida East Coast Ry., 5 Cir., 1968, 399 F.2d 854, 856. In doing so the Court must attempt to place itself in the respective positions of the parties to determine their intent when the contract was signed. The process includes consideration of all surrounding circumstances including the language of the agreement and actions of the parties during negotiation.

■ In interpreting Morris' employment contract, which contains no expressed terms regarding chargebacks, we consider the agreement as a whole in the setting of the parties but without regard to what each side's witnesses de-

scribed the intention to have been. At the outset, the agreement is entitled "New Sales Agreement" with no reference to being a modification of an existing employment contract. The agreement provides that Morris "will be placed under a salary and new business commission basis for the sales in Broward and Dade Counties in Florida." No mention is made that Morris will lose commissions from old lines of business. To the contrary, the structure is to distinguish sharply between old business and new business. For old business the commission system is out altogether. For servicing old business including renewals of it, the sole compensation is a salary. The only business subject to commission is new business written after December 1970.

Additionally, there is even less basis for concluding, as Insurer insists, that while denominated a "new" employment contract it was really meant to be a sort of adjunct to the former employment contract. This contract in its main part (para. 3) prescribed that the employee will be compensated in accordance with the "Premium Plan of Compensation" which was attached. Except for a single rare case,[4] the method of compensation prescribed is that of commissions on new and renewal business.[5]

Out of a system of commissions as the source and measure of compensation comes the appropriateness of debits when premiums are lost or reduced. When a fixed salary, not variable commissions, is the source the reason for chargebacks is gone and unless expressly required they are not to be implied.

The chargebacks were improper.

### Transfer Agreement

In June 1970, again at the instigation of Insurer, Morris was required to and did transfer over to a new district manager, Johnson, a number of his accounts. This was a practice of Insurer as a way of assisting a new salesman in working up accounts of his own. In this case it was also motivated by the fact that Insurer felt that Morris with half a million in gross premiums had too much business to handle.

To reimburse Morris for his lost base earnings in the transfer of his commercial accounts to the new agent, Insurer agreed to pay Morris $7,352.00 in monthly payments extending over a five year period.[6] The letter agreement made no reference to any contingencies on the payments such as continued employment with the company. However, when Morris left the company in January of 1971, the payments were terminated even though nearly $6,000.00 of the amount remained unpaid. Insurer argued that the payment was calculated

---

4. Limited to certain policy holders it provided: "It is agreed that on certain policy holder accounts the base earnings or new premium rates of commission or both may vary from the above schedule of commissions."

5. The manual, Sec. 3, Sub. 1, reflects that district managers (as was Morris) might receive a subsidy to be fixed by Insurer.

6. The letter agreement provided:

It has been agreed that we are to reimburse you for loss of commercial lines base earnings only.

Attached to your copy of the list of commercial accounts being transferred from you to Don is a tape which has been run on the adjusted base. It totals $2,774.72, or for reimbursement purposes, $2,775. We propose to pay you in the following manner beginning on May 1, 1970, which is the effective date of the transfer:

| | | |
|---|---|---|
| first year $2220 | or $185 per month | (80¢ for each of $2775) |
| second year $1803 | or $150 per month | (65¢ for each of $2775) |
| third year $1387 | or $116 per month | (50¢ for each of $2775) |
| fourth year $1110 | or $ 93 per month | (40¢ for each of $2775) |
| fifth year $832 | or $ 69 per month | (30¢ for each of $2775) |
| $7,532.00 | | |

on the value of the commissions for contracts transferred to the new agent. When he terminated his employment with the company, all compensation ended—payments for transfer as well as salary.

The same rules of contract interpretation will apply to this agreement of transferring Morris' accounts. Shuford Development Co. v. Crysler Corp., *supra*; Southern Bell Tel. & Tel. Co. v. Florida East Coast Ry., *supra*. A reading of the contract indicates that the intent of the parties was to compensate Morris for the loss of base earnings from the commercial accounts being transferred to the new agent.

In the very way it was structured, the formula is itself an estimate of what Morris would have received over a five year period had he retained the accounts as his own. That this was dealing with events which were necessarily unknown —or even ascertainable except on the basis of some informed estimate of the future—is reflected by the fact that the amount per dollar payable annually for 5 years ran from a high of 80¢ for the first year to a low of 30¢ for the fifth (last) year. (See note 6, supra.)

Morris had a valuable property interest in the potential renewals of accounts which he was required to surrender. The unqualified promise to pay a fixed sum which was demonstrated both by the total and the annual amounts plus the formula for calculating them cannot be extinguished by the mere fact of termination of employment.

*Incurred Losses*

The final issue on appeal concerns Morris' liability to Insurer for an out-of-court settlement of a claim made by Insurer on unauthorized fire insurance coverage handled by Morris.[7] The District Court ordered that Morris reimburse the company for the $10,000.00 settlement as well as nearly $2,400.00 in attorney's fees. (See Item (ii), note 2, supra.)

In July 1969, Morris gave a binder for fire insurance coverage in the amount of $40,000, in violation of company rules, to Assured, the owners of Lindy's Restaurant. Morris was introduced to Assured by Tom Fryer, an insurance agent whom Assured referred to as their "insurance man." Fryer had come to Morris because Fryer did not have fire coverage available directly. A check for $88.00 drawn by Assured payable to Insurer was given to Morris as payment for 20% of the annual policy premiums. When Morris was advised that Insurer would not issue a policy, Morris returned the $88.00 check to Tom Fryer.[8] Fryer endorsed the check made payable to Insurer and deposited it in his personal account.[9]

The fire occurred in April 1970— eight months after the first and only payment had been made. The owners estimated damages at $65,000.00 and filed a suit against Insurer for reimbursement. Insurer settled out of court for $10,000.00 and argues that the settlement was a wise business judgment since Morris had bound the company under the theory of apparent authority.[10]

7. Insurer had two rules regarding issuance of fire insurance policies. For restaurants, before a policy could be issued, the restaurant had to be inspected. Where a binder was given a written application that the insurance company was bound had to be submitted to the company on the same day as the coverage was to go into effect. Morris failed to comply with either rule.

8. Morris stated that he attempted to return the check directly to Assured but could not contact them. Therefore, he gave the check to Tom Fryer who agreed to return the check to the owners.

9. Assured was apparently indebted to Fryer on their other insurance matters handled by him. Through bank statements Assured was aware that Fryer, not Insured, had negotiated the premium check.

10. Mr. Robert Berryhill, a claims manager with Insurer, reviewed the investigation of the Lindy claim and concluded that there was no contractual coverage but felt as a practical matter a settlement was preferable. The settlement amount of $10,000.00 was recommended by Insurer's counsel and agreed upon by company officials.

With Morris acknowledging breach of two instructions (note 7, supra), Insurer naturally stressed the well settled Florida principle that:

> "[A]n agent owes to his principal the obligation of high fidelity, and that he may not proceed without or beyond his authority, particularly where he has been forbidden to act and that so proceeding, his actions caused loss to his principal, the agent is fully accountable to the principal therefor."

Crawford v. DiMicco, 216 So.2d 769, 772 (Fla. 4th Dist. 1968). Insurer claims that it suffered a loss since Morris, despite these breaches, proceeded to represent to Assureds that they had coverage. These actions on the part of Morris, although in violation of internal limitations, were done under the apparent authority of Insurer so that it had a potential liability under the coverage as initially afforded.

The trouble with Insurer's position is that it acted without either (i) a judicial determination that by reason of Morris' conduct it was legally liable or (ii) adequate notice by vouching in or otherwise to Morris of its intention to hold him liable for any losses in the defense of the Assureds' suit on the vicarious policy.

■ We do not mean to hold either generally or in an Erie-way for Florida that faced with the peril of major loss a principal has to suffer that risk to secure indemnification. The principal suffers loss when the agent's default has exposed it to such risks. Settlements if prudently made and with adequate notice can fix the indemnitor's liability with little more thereafter than establishing the fact of the agent's wrong—a factor here undisputed.

With today's penchant for utilizing rules which were intended to simplify litigation as a means of making it more complicated, the usual tactic is an impleader. See, Rule 14, F.R.Civ.P. Sometimes that tactic is poor strategy.[11]

But that does not leave the party helpless. For the law has, almost from the beginning of time, afforded a convenient, easy, non-obnoxious device to shift the burden of defense on the express or implied indemnitor or saddle him with the consequences of the outcome. It is the simple vouching in—a latter day shorthand for the voucher to warranty of ancient days—which requires nothing more than a letter with perhaps the precaution of registered or certified mail.

Florida recognizes this,[12] as Judge Barns demonstrates in his fascinating opinion in Olin's Rent-A-Car System, Inc. v. Royal Continental Hotels, Inc., D.Ct.App., 1966, 187 So.2d 349, 351, et seq.[13]

Here there was no impleader (see note 11, supra.) nor even any notice to Morris by voucher or otherwise either of the suit[14] or a purpose to look to him for reimbursement.

The absence of any such Voucher/Notice puts a heavy burden of evidentiary proof on one asserting the (i) existence of serious exposure to substantial liability and (ii) the reasonableness of a settlement.

This is reflected by the meager record made by Insurer here. The only word testimony of reasonableness came from the claims manager who relayed as hearsay the fact that counsel had recommended the settlement. There was no indication of what kind of an investigation had been made, or what it reflected. On the status of Fryer[15] *vis-a-vis* As-

---

11. Insurer's claims manager implied as much here since to have formally impleaded Morris might give the appearance of more merit to the claim than warranted.

12. See 17 Fla.Jur. § 7.

13. He traces it back to twelfth century Teutonic law.

14. Morris' deposition was apparently taken in the Assured's suit, but by whom or what he said is a complete mystery.

15. Cat'N Fiddle, Inc. v. Century Insurance Co., Fla., 1968, 213 So.2d 701, reflects the strong holding that, standing alone, the actions of Morris in notifying Fryer would

sureds or their understanding of his actions in receiving, endorsing, and negotiating their check, payable to Insurer, either by way of investigative statements, or by pretrial discovery deposition in the insurance suit, not a word appears.

Since Morris was neither aware of the proposed or consummated settlement, nor notified by voucher or otherwise that Insurer would look to him for reimbursement, we hold that the record was not sufficient on which to base the requisite finding of a prudent settlement. So Insurer fails on this too.

Reversed.

have been ineffective in cancelling the policy. But it recognizes that it is a question of agency and knowledge, if any, on the part of the Assured as to what the broker-agent has done.