**In re MID–AMERICA CORPORATION, a Tennessee corporation, Debtor.**

**Bankruptcy No. 91–5316–BKC–3P1.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Aug. 9, 1993.

Ronald Bergwerk, Jacksonville, FL, for debtor.

Richard Thames, Jacksonville, FL, for claimant,

Gardner Davis, Jacksonville, FL, for King Provision Corp.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court on debtor's objection to claim 25 filed by Burger King Corporation ("Burger King") and Burger King's Motion to Allow and Estimate Claim for Plan Voting Purposes. The Court held hearings on May 13, 1993, and June 4, 1993. Upon the evidence presented, the Court enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Debtor operated twenty-one Burger King restaurants in the Knoxville, Tennessee, area. Each of the restaurants was the subject of standardized Burger King franchise agreements. Five of the twenty-one restaurants were leased directly from Burger King.

Each of the franchise agreements requires the franchisee to pay the franchisor royalties in the amount of three and one-half percent (3.5%) of gross monthly sales for the use of the Burger King system and trademarks. In addition, the franchisee is required to pay the franchisor four percent (4%) of gross monthly sales for advertising on a national and regional basis.

In return, the franchisor is required to periodically advise and consult with the franchisee, provide an operations manual, marketing and advertising data and advice, an accounting and inventory system, management training, and other operational support such as "mystery shoppers" to grade the performance of the restaurant.

Debtor filed its petition under 11 U.S.C. Chapter 11 on October 11, 1991.

After filing for relief debtor closed restaurants 389, 442, 2270 and 6108. Restaurants 389 and 442 were leased from Burger King. Debtor rejected the lease agreements for these two restaurants. Debtor has not rejected the franchise agreements.

On August 14, 1992, Burger King filed claim 25 in the amount of $2,975,632.80 for unpaid advertising and royalty fees, rent, property taxes, sales training, promotional expenses, trade debt, lease rejection and franchise rejection damages.

On December 31, 1992, debtor filed written objection to Burger King's claim.

### Conclusions of Law

### Claim 25

The Code addresses the allowance of claims in § 502 which states in pertinent part as follows:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2), (f), (g) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim....

Thus a claim is presumed valid as filed and is prima facie evidence of validity and amount unless a party in interest objects. The objecting party must present affirmative proof to support an objection. However, the ultimate burden of persuasion by a preponderance of the evidence rests with the claimant. *In re St. Augustine Gun Works, Inc.*, 75 B.R. 495 (Bankr.M.D.Fla. 1987); *In re The Securities Groups*, 116 B.R. 839 (Bankr.M.D.Fla.1990); *In re Brinson*, 153 B.R. 952 (Bankr.M.D.Fla.1993). After objection and upon the evidence presented, the Court will determine the allowable amount of the claim. *Id.* Burger King filed claim 25, and debtor objected to the amount of the claim. Consequently, the Court must determine the allowable amount of the claim.

### Pre–Petition Royalty, Advertising and Lease Rejection Damages

The franchise agreements between Burger King and debtor require that debtor pay monthly royalty and advertising fees to Burger King. The contracts state:

8. ROYALTIES AND ADVERTISING CONTRIBUTION

A. Royalties

Franchisee agrees to pay to BKC a royalty of 3.5% of gross sales for the use of the Burger King System and the Burger King Marks. Royalties shall be paid monthly by the tenth (10th) day of each month based upon gross sales for the preceding month.

B. Advertising, Sales Promotion and Public Relations

In addition, FRANCHISEE shall pay to BKC an amount equal to 4% of FRANCHISEE's monthly gross sales by the tenth (10th) day of each month based upon FRANCHISEE's gross sales for the preceding calendar month. This sum less direct administrative expenses, will be used for advertising, sales promotion and public relations both in the market area (A.D.I.) in which the Franchised Restaurant is located and on a national basis including creative, production, media and clearance costs of advertising and sales promotion materials and those market research expenditures directly related to the development and evaluation of the effectiveness of advertising and sales promotion. All such expenditures shall be at the discretion of BKC.

The parties agree that Burger King has a claim in the amount of $567,507.55 for pre-petition advertising and royalty fees due from debtor's restaurants.

In § 502(g) the Code specifically provides for a claim for damages caused by debtor's rejection of an unexpired lease. Section 502(g) states as follows:

> (g) A claim arising from the rejection, under section 365 of this title ... of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

Section 502(b)(6) then limits the amount of the claim created in subsection (g) upon the rejection of a lease of real property. Section 502(b)(6) states in pertinent part as follows:

> (b) Except as provided in subsections (e)(2), (f), (g), and (i) of this section if such objection to a claim is made, the court, after notice and a hearing shall determine the amount of such claim ... except to the extent that—
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
> > (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of

> > (i) the date of the filing of the petition; and
> >
> > (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
> >
> > (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

Burger King amended its claim to reflect the § 502(g) cap on real property lease rejection damages at the hearing held in June 1993. The parties agree that § 502(b)(6) limits Burger King's claim for lease rejection damages from store number 389 and 442 to $124,071.21

### Pre–Petition Rent and Property Taxes

Debtor leased stores 389, 442, 1168, 599 and 1097 from Burger King. Pursuant to the lease agreements debtor was required to pay Burger King a fixed minimum annual rental plus a percentage rental. The required percentage rental amount was six percent (6%) of gross sales in years one through four and eight and one-half percent (8.5%) in years five through twenty. The required percentage rental payment was the amount by which the percentage of gross sales exceeded the dollar amount of the fixed rent payment.

At the June 4, 1993, hearing Burger King amended its claim for rent due. Debtor did not object to the adjustments. Thus, Burger King's revised rent claim is presumed valid and is allowed in the amount claimed as amended by Burger King's Exhibit number 1.[1]

Burger King also amended its claim for property taxes on these restaurants at

---

1. The rent and property tax portions of Burger King's claim as amended on June 4, 1993, are as follows:

| Store # | Base Rent | Percent Rent | Property Tax |
| --- | --- | --- | --- |
| 599 | $16,529.84 | $10,174.46 | $ 7,487.74 |
| 1097 | $19,077.15 | . | $ 4,902.06 |
| 1166[sic] | $18,717.18 | | $ 6,988.52 |
| 389 | $14,007.73 | | $ 6,686.32 |
| 442 | $17,974.12 | | $13,584.89 |
| Total | $86,306.02 | $10,174.46 | $38,672.55 |

the June 4 hearing. Debtor objects to the amount of property tax claimed. Debtor argues that Burger King is attempting to file a new claim under the guise of amending its tax figures citing as authority *In re International Horizons*, 751 F.2d 1213 (11th Cir.1985). In *International Horizons*, the Eleventh Circuit recognized that the amendment of claims should be freely allowed to cure a defect or to more fully explain a claim but that an amendment to a claim filed after the bar date should be closely scrutinized to ensure it is not an attempt to file a new claim. The claimant in *International Horizons* amended its claim from $70,000.00 to $20,000,000.00 by adding a previously unclaimed category of tax to the claim. The Eleventh Circuit affirmed the lower court's determination that the claim should not be allowed because it represented an attempt to file a new claim.

*International Horizons* is distinguishable from this case because Burger King's property tax adjustment increased its overall claim only slightly. Burger King increased its claim for property tax from $16,062.02 to 38,672.55, a difference of $22,610.53, in a claim for $2.6 million. Burger King did not add a new category or type of tax to its claim as was attempted in *International Horizons* rather Burger King adjusted its existing figures and, in one case, claimed taxes that had not previously been claimed. Thus, Burger King's amendment is not an attempt to file a new claim.

■ In challenging Burger King's figures in its amended claim debtor did not offer any evidence of the proper amount of taxes due. Burger King's representative, Mr. Joseph Heeb, Sector Controller for Burger King's mid-atlantic region, testified that he did not know why the amounts had changed and was unable to provide an explanation for the change. Mr. Heeb testified that Burger King had paid the taxes but could provide no other information. Debtor failed to overcome the claim's presumption of validity. However, Burger King failed to meet its burden of persuasion. Because neither party produced evidence of the correct amounts for the property taxes, the Court will allow the amount claimed in Burger King's original proof of claim for property tax.

## Premise Damages

Burger King claimed $84,705.00 for premise damages to store 389 and store 442. Burger King did not repair the damage to these stores, rather the buildings were demolished. Recognizing that it did not suffer any out-of-pocket losses to repair the buildings, Burger King has abandoned this portion of its claim.

## Trade Debt

■ Debtor challenges the amount of Burger King Distribution Services debt charged to store 4986. Debtor purchased a quantity of "Bart Simpson" dolls as promotional items. Sales on the dolls were poor, and debtor returned the unsold dolls for credit. Debtor's President, Merritt C. Fore, testified that debtor did not receive credit for the merchandise returned even though he had received a letter from Scott Colabuono, Chief Financial Officer of Burger King, that stated that 77% of the returned dolls had been sold and that individual franchisees would receive the appropriate amount of credit at a later date. Burger King's representative testified that debtor would have received credit for the dolls Burger King was able to sell at the time all other franchisees received credit. However, Mr. Heeb was unable to say when the credit was received. Burger King added approximately $30,000.00 to store 4986's debt to Burger King Distribution Services in claim 25 for the Simpson dolls.

Debtor shifted the burden to Burger King to present affirmative proof of the amount of their claim in regard to store 4986's Burger King Distribution Services debt when Mr. Fore testified that debtor had not received credit for the dolls. Burger King was unable to establish that it had given debtor credit. This is insufficient to support its claim for $82,743.81. Thus the Burger King Distribution Services debt allocated to store 4986 is allowed in the amount of $52,743.81. This amount re-

flects the "approximately $30,000.00" (Tr. I–25) Mr. Fore testified was owed debtor for the returned dolls then sold by Burger King.

### Future Royalties and Advertising Fees

A. Future Royalties

■ Burger King claims lost future royalties for the remainder of the contract term for each of the closed restaurants. Debtor argues that Burger King is not entitled to future royalties because the franchise agreements are licenses and impose no obligation upon debtor to continue to operate the restaurants. Debtor cites the "Franchise Grant: Term" section of the agreements as support for its contention that the agreement is a license. That section reads as follows:

> BKC grants to FRANCHISEE a license to use the Burger King System and the Burger King Marks in the operation of a Burger King Restaurant (Franchised Restaurant) at ... The term of this Agreement shall commence on February 26, 1982, and shall expire on February 24, 1998, unless sooner terminated in accordance with the terms of this Agreement.[2]

2. The terms of the franchise grants in the contracts for the closed stores are as follows: store 389 from February 26, 1982, to February 24, 1998, and store 442 from February 26, 1982, to March 31, 2000. The franchise agreement for store 2270 differs from that of 389 and 442 and reads as follows:

A. Franchise Grant. [C]ompany licenses to Franchisee for the term hereof the Company's right to use at the premises and in the operation of such restaurant, the names BURGER KING and HOME OF THE WHOPPER together with such other insignia, symbols and trademarks....
B. Term. The term of the Franchise Agreement shall commence on the date Franchisee's restaurant opens for business and shall expire at midnight on the day preceding the twentieth (20th) anniversary of said opening, unless sooner terminated in accordance with the terms and conditions hereof.
Debtor and Burger King entered the franchise agreement for store 2270 on June 7, 1978.
The franchise agreement for store 6108 also differs from the others and reads as follows:

Burger King points to the "Default" section and the "Hours of Operation" section and argues that because these sections are inconsistent with the licensing language in the grant section the Court should utilize parol evidence to ascertain the intention of the parties and the meaning of the agreements. The Hours of Operation section reads as follows:

> The entire Franchised Restaurant shall be open for business at a minimum 11:00 A.M to 11:00 P.M., seven (7) days a week, fifty-two (52) weeks a year unless otherwise authorized or directed by BKC. The Franchised Restaurant may be closed on Thanksgiving and/or Christmas if a majority of the Burger King Restaurant operators in the market area (A.K.I.) in which the Franchised Restaurant is located elect to close on the holiday.[3]

The contract defines one event of default as follows:

> (4) FRANCHISEE voluntarily abandons the franchise relationship. The cessation of operation of the Franchised Restaurant other than with the consent of BKC shall be considered a voluntary abandonment of the franchise relationship. If this act of default shall occur, BKC shall have the right to immediately terminate

FRANCHISE GRANT: TERM AND LOCATION
BKC grants to Franchisee and Franchisee accepts a franchise for a period of Twenty (20) years to use the Burger King System and the Burger King Marks only in the operation of a Burger King Restaurant ("Franchised Restaurant") at ... The term of the Agreement shall commence on the date the Franchised Restaurant opens for business (the "Commencement Date") and shall expire Twenty (20) years thereafter (the "Term") unless sooner terminated in accordance with the provisions of this Agreement. FRANCHISEE agrees to operate the Franchised Restaurant at the specified location for the entire Twenty (20) year Term.... The contract was entered in 1988 and would have run until 2008.

3. The franchise agreement for store 6108 requires that the restaurant be open from 7 a.m. to 11 p.m. daily and the agreement for store 2270 allows the hours to differ upon the request of the franchisee and the consent of Burger King.

the license.[4]

■ It is hornbook contract law that the meaning of a contract is determined from the parties' intentions at the time the contract is formed. *Morris v. Federated Mut. Ins. Co.*, 497 F.2d 538 (5th Cir.1974). Generally, the court will make this determination from the "language used, other provisions in the agreement, ... and the surrounding circumstances at the time the agreement was entered into." *J & S Coin Operated Machines, Inc. v. Gottlieb*, 362 So.2d 38 (3rd DCA Fla.1978). Evidence of the parties' intentions is properly admitted to interpret terms that are subject to different interpretations. *Hancock v. Brumer, Cohen, Logan, Kandell & Kaufman*, 580 So.2d 782 (Fla. 3rd DCA 1991); *Forest Hills Utilities, Inc. v. Pasco County*, 536 So.2d 1117, (Fla. 2d DCA 1988).

The Court agrees with Burger King's assertion that the default section indicates an affirmative obligation to operate the restaurant. If the agreement imposed no obligation for continued operation then voluntary abandonment would not constitute an event of default and the inclusion of that section would be surplusage. In construing contracts, the Court should make every attempt to give effect to every provision. *Excelsior Paddock v. Bay Concrete Indus., Inc.,* 154 So.2d 313 (Fla. 2d DCA 1963).

Additionally, both Mr. Fore and Mr. Heeb testified, without objection, that they intended for debtor to run the restaurants for the entire contract term.

Debtor is clearly in default because it has closed four restaurants and in so doing has voluntarily abandoned the franchises.

Thus, the Court finds that the franchise agreements impose some obligation on debtor to continue to operate a franchise restaurant and that Burger King is entitled to damages for the breach of the franchise agreements for stores 389, 442, 2270 and 6108.

■ The Court must now determine the amount of these damages. Burger King argues that it is entitled to the gross royalty payments it would have received from debtor had the four franchises remained open. On cross examination, Mr. Heeb testified that some of the royalties collected from franchisees were utilized to pay a portion of corporate office's overhead and administrative expenses.

The franchise agreements specify that they are governed by and should be construed in accordance with Florida law.[5] The contracts also specifically reserve all rights afforded by Florida law in the event of default.[6] In seeking an award of gross royalties, Burger King attempts to be placed in a better position than it would have been in had the franchise agreements been fully performed and this is contrary to Florida law. *Campbell v. Rawls*, 381 So.2d 744 (Fla. 1st DCA 1980).

■ Florida law allows the non-breaching party to choose between being placed in the position it would have been in had the contract been fully performed by seeking lost profits or to be placed in the position it was in prior to entering the contract by seeking the ·reasonably foreseeable damages flowing from the breach. *Plantation Key Developers v. Colonial Mortgage Co. of Indiana*, 589 F.2d 164 (5th Cir.1979).

4. The agreement for store 6108 contains slightly different language while the agreement for store 2270 states that "ceasing to do business at the premises" constitutes a default.

5. The contracts provide:
C. Governing Law
(1) This agreement shall become valid when executed and accepted by BKC at Miami, Florida; it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida. The choice of law designation does not require

that all suits concerning this Agreement be filed in Florida.

6. The "Effect of Termination" section (5) in the contracts for store 389, 442 and 6108 states "The foregoing shall be in addition to any other rights or remedies of BKC that exist under statute, regulation or common law." The contract for store 2270 reserves all "rights or remedies provided hereunder or by law or equity, to terminate this agreement" but does not make a specific reservation of rights after termination.

In *Aldon Industries, Inc. v. Don Meyers & Assoc., Inc.*, the Fifth Circuit explained that an award of lost profits requires the "[p]roof ... show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's wrongful conduct." 517 F.2d 188, 191 (5th Cir.1975). The Court explained further that "[w]hether damages are speculative must be determined by inquiry into both causation of the damage and measurement of damages. The term speculative is basically a characterization of the evidence introduced to prove the damages." *Id.* at 191; *Butler v. Mirabelli,* 179 So.2d 868 (Fla. 2d DCA 1965). The amount of lost profits must account for and deduct expenses from the gross profit amount. *Southern Bell Telephone and Telegraph Co. v. Kaminester,* 400 So.2d 804 (Fla. 3d DCA 1981).

Thus to determine the damage award Burger King is entitled to pursuant to Florida law, Burger King must show with reasonable certainty the amount of its lost future profit and show that the loss was the result of debtor's breach. Mr. Heeb was unable to provide an amount or a percentage that represented expenses paid by royalties to allow the Court to determine the net profit Burger King could expect to receive from the royalties on the four stores. Mr. Heeb stated that the Burger King system was not set up to allocate expenses to individual franchises and their royalty payments so he could not provide the Court with information that would allow it to ascertain the amount of Burger King's profit from royalty payments.

Nor can the Court award damages to place Burger King in the position it was in prior to the contract because there is insufficient evidence on which to base such an award. Mr. Heeb testified that Burger King incurs expenses to service its franchisees but no amounts were offered. As with its inability to provide expense data for lost profits, this lack of evidence does not give the Court enough certainty to allow a damage award.

Accordingly, even though the Court finds that debtor had an obligation to operate the restaurants and that Burger King suffered some damage from debtor's abandoning the franchises, the future royalty claims must be disallowed because the evidence was insufficient for the Court to ascertain an amount of damage. This lack of evidence renders any award the Court could make too speculative to be allowed.

B. Future Advertising

Burger King also claims lost future advertising revenue. Again Burger King argues that it is entitled to the entire amount that debtor would have had to pay for the four stores until the end of the twenty year term reduced to its present value.

Debtor again argues that the agreements are licenses and impose no affirmative obligation on debtor to continue operations. Debtor also argues that Burger King has sustained no loss because Burger King had no rights in the advertising money and thus did not suffer a loss from debtor's failure to pay and the resulting decrease in the fund.

The Court agrees with debtor that Burger King is not entitled to claim lost advertising funds. Mr. Heeb testified that the company would not spend more than was available in the fund. Mr. Heeb also testified that the advertising revenues are not a profit center for Burger King. The fund is comprised of contributions from franchisees, not from Burger King. Burger King does not receive the advertising money for its own benefit but rather uses it to purchase advertising and promotional items for the benefit of its franchisees. Any benefit Burger King receives is indirectly through increased royalty payments from increased sales generated by advertising.

Burger King argues that the decreased funds available for advertising creates an advantage for its competitors and thus causes Burger King damage in the form of lost royalty revenues. There was no evidence presented that showed such a causal link and no evidence of an amount of dam-

age. Thus this claim, too, is speculative and cannot be allowed.

Summary of Allowance of Claim 25

| | |
|---|---|
| Pre-petition Advertising Expense | $303,006.84 |
| Pre-petition Royalty Expense | $265,130.71 |
| Lease Rejection Damages | $124,071.21 |
| Pre-petition Rent Expense | $125,187.76 |
| Property Tax | $ 16,062.02 |
| Trade Debt Store 4986 | $ 52,743.81 |
| Total | $886,202.35 |

In addition to this amount, claim 25 includes $598,169.92 that was unchallenged by debtor. Thus claim 25 is allowed in the total amount of $1,484,372.27.

*MOTION TO ALLOW AND ESTIMATE CLAIM FOR VOTING PURPOSES*

Burger King filed a Motion to Estimate Claim for Voting Purposes. Based on the Court's determination of the allowable amount of claim 25, the motion is denied as moot.

*CONCLUSION*

Claim 25 is allowed in the amount of $1,484,372.27. Burger King's Motion to Allow and Estimate Claim for Voting Purposes is denied as moot. A separate order consistent with these findings of fact and conclusions of law will be entered.

*ORDER SUSTAINING IN PART AND OVERRULING IN PART DEBTOR'S OBJECTION TO CLAIM 25 AND DENYING MOTION TO ALLOW AND ESTIMATE CLAIM FOR PLAN VOTING PURPOSES AS MOOT*

This case is before the Court upon debtor's objection to claim 25 filed by Burger King Corporation and Burger King Corporation's Motion to Allow and Estimate Claim for Plan Voting Purposes. Upon findings of fact and conclusions of law separately entered, it is

ORDERED

1. Debtor's objection to claim 25 is sustained in part and overruled in part.

2. Claim 25 is allowed in the amount of $1,483,695.15.

3. Motion to Allow and Estimate Claim for Voting Purposes is denied as moot.