FLORIDA EAST COAST RAILWAY COMPANY, a Florida Corporation, Plaintiff–Appellant/Cross–Appellee,

v.

CSX TRANSPORTATION, INCORPORATED, Defendant–Appellee/Cross–Appellant.

Nos. 93–2601 & 93–2742.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1994.

Decided Dec. 21, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 6, 1995.

**1126**

Jerome H. Torshen, Abigail K. Spreyer, Torshen, Schoenfield & Spreyer, Chicago, IL, Eugene Crew (argued), Richard L. Grossman, Amy Slater, Townsend & Townsend Khourie & Crew, San Francisco, CA, for plaintiff-appellant.

Paul V. Esposito, James R. Gannon, Lewis, Overbeck & Furman, Chicago, IL, Richard McMillan, Jr. (argued), Alexandre de Gramont, Scott L. Winkelman, Thomas P. Humphrey, Crowell & Moring, Washington, DC, for CSX Transp., Inc.

Frederick L. Wood, Nicholas J. DiMichael, Richard D. Fortin, John S. Markle, Donelan, Cleary, Wood & Maser, Washington, DC, for National Industrial Transp. League.

Richard A. Allen, Richard P. Schweitzer, Zuckert, Scoutt & Rasenberger, Washington, DC, for American Bus Ass'n.

Before BAUER, FLAUM and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Florida East Coast Railway Company ("FEC") has sued CSX Transportation, Inc. for breach of a 1978 Settlement Agreement requiring that "[w]henever [CSX] establishes routes and rates ... it will also establish routes and rates on the same basis to or from any point served by FEC...." CSX argues that the Settlement Agreement does not ap-

ply to privately negotiated contract rates, which were legalized only after execution of the Agreement by the Staggers Rail Act of 1980, and that even if it did, application of the Agreement to those rates would violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The district court found that the Settlement Agreement applied to contract rates, but that its application in that context was indeed prohibited by the Sherman Act. Because we believe that the Settlement Agreement does not apply to contract rates, we affirm the judgment of the district court, but do so without reaching the antitrust issue.

I.

In 1963, the Seaboard Air Line Railroad Company ("SAL") and the Atlantic Coast Line Railroad Company ("ACL") merged to form the Seaboard Coast Line Railroad ("SCL"). SCL later became part of the Family Lines Rail System, which was ultimately acquired by CSX Corporation in 1979. Prior to the 1963 merger, SAL and ACL had competed for rail traffic in the southeastern United States. Because only SAL and FEC had tracks that served areas in Florida south of Jacksonville, ACL and FEC had together established a joint rate for traffic moving from the north to points south of Jacksonville, which competed with the single-line rate offered by SAL for those same routes. When the SAL/ACL merger was proposed, FEC protested, fearing that because ACL would now send its southern Florida traffic via SCL's new single-line service, FEC would lose the southern Florida traffic it had formerly received from ACL. In response to FEC's complaint and consistent with the then-favored policy of rate equalization, the Interstate Commerce Commission ("ICC") imposed several conditions on the SAL/ACL merger. Relevant among those was the requirement that SCL maintain through routes with FEC to southern Florida and establish joint rates for those routes that would be no higher than SCL's single-line rates.[1] Such

1. FEC was not the only carrier affected by the SAL/ACL merger; several other small carriers also objected to the merger for similar reasons. The merger conditions therefore were actually

framed more generally than reflected here, affecting routes in addition to that of FEC. *See Seaboard Air Line Company–Merger–Atlantic Coast Line Railroad Company,* 320 ICC 122

rate equalization was possible because ICC approval exempted the merger from operation of the antitrust laws.[2]

The parties then coexisted without dispute until 1977, when FEC filed a complaint before the ICC, alleging that SCL was not abiding by the merger conditions. That dispute was ultimately resolved by way of an April 10, 1978 Settlement Agreement, to which CSX became subject when it acquired SCL in 1979. The stated purpose of the Settlement Agreement was "to reaffirm Conditions 1 through 6 prescribed in the *SAL/ ACL Merger* case ... and to provide ... additional provisions to govern the relationship between SCL and FEC only, in light of those conditions." (Settlement Agreement at 1.) The Agreement further provided that:

> In interpreting the substantive provisions of the Agreement, it shall be borne in mind that it is the intent of the parties that SCL will not take steps to place FEC in a position so that it cannot fairly compete with SCL on an equal basis on traffic destined to the South Florida Area ... served by them both and that SCL will, insofar as it is within the power of SCL to do so, take the steps specified herein so that FEC may fairly compete with SCL.

(*Id.*) Specifically relevant here, the Agreement provided in Paragraph J:

> SCL agrees that it will maintain rates and keep open routes, including transit, from and to FEC stations via existing junctions and gateways.
>
> Whenever SCL establishes routes and rates, including transit, to or from any point served by it on SCL's line between West Lake Wales and Sunniland or on its

line between West Lake Wales and Homestead, including lines branching therefrom, it will also establish routes and rates on the same basis to or from any point served by FEC via the Jacksonville Gateway at FEC's election.

In 1980, Congress passed the Staggers Rail Act, Pub.L. No. 96–448, 94 Stat. 1895 (1980), with the goal of introducing competition into the railroad industry. (*See* 49 U.S.C. § 10101a.) The Staggers Act changed the face of the railroad industry and as a result brought into question the continued viability of the Settlement Agreement. In particular, CSX pointed to two new circumstances in which it believed that compliance with the Agreement was no longer possible. First, in 1981, pursuant to the authority provided by 49 U.S.C. § 10505, the ICC deregulated trailer-on-flat-car ("TOFC") and container-on-flat-car ("COFC") traffic and, as part of the exemption of that service from its jurisdiction, removed antitrust immunity for collective rate-making as to that traffic. In response to this change, CSX contended that it could no longer comply with paragraph J of the Settlement Agreement for TOFC/ COFC service without violating Section 1 of the Sherman Act. Second, although rates had previously been established only by way of published tariff, Staggers Act § 208(a), 49 U.S.C. § 10713, now allowed railroads to privately negotiate rates with shippers.[3] CSX contended that Paragraph J of the Settlement Agreement did not apply to privately negotiated contract rates, which had been illegal both when the merger conditions were imposed and when the Settlement Agreement was executed, and that even if it did,

(1963). We are concerned here only with the impact of the merger conditions on SCL and FEC.

**2.** 49 U.S.C. § 11341 (formerly 49 U.S.C. § 5(12)) provides:

> The authority of the Interstate Commerce Commission under this subchapter is exclusive. A carrier or corporation participating in or resulting from a transaction approved by or exempted by the Commission under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority. A

carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction.

**3.** 49 U.S.C. § 10713 provides:

> One or more rail carriers providing transportation subject to the jurisdiction of the Interstate Commerce Commission ... may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions....

rate equalization for that service would violate Section 1 of the Sherman Act.

In response, FEC filed a federal suit in the District of Columbia seeking enforcement of the Settlement Agreement as to both TOFC/COFC and contract rate traffic. Following a bench trial, the court found that the deregulation of TOFC/COFC service did not affect the antitrust immunity of the 1963 merger conditions, so that abiding by the terms of the Settlement Agreement for that traffic would not violate the Sherman Act. *Florida East Coast Ry. Co. v. Seaboard Coast Line R.R. Co.*, 1982–83 Trade Cas. ¶ 65,111 at 71,213–16, 1982 WL 1926 (D.D.C.1982). The court abstained from deciding whether application of the Settlement Agreement to contract rates would violate the Sherman Act, finding that the issue was not yet justiciable because FEC had not identified any particular instance in which CSX had actually refused to abide by the Settlement Agreement when negotiating contract rates. *Id.* at 71,-217–18.[4]

FEC ultimately returned to federal court in 1991, this time in the Northern District of Illinois, after General Motors Corporation, in response to the submission of competitive bids, discontinued its use of joint-line CSX/FEC service for shipments to southern Florida in favor of CSX single-line service. Count I of FEC's complaint asserted that CSX had breached the Settlement Agreement when it contracted with General Motors and other unnamed parties to provide single-line service without offering FEC the opportunity to provide joint-line service under the same rate. Count II asked the district court to declare that the Settlement Agreement required CSX to set joint-line contract rates with FEC that match its single-line contract rates and that this requirement did not violate Section 1 of the Sherman Act. Count III claimed that by refusing to set joint-line rates with FEC, CSX was attempting to monopolize the southern Florida market in violation of Section 2 of the Sherman Act.

Following an eight-day bench trial on Counts I and II, the district court found that the Settlement Agreement did extend to contract rates, but that compliance with its terms in that context amounted to *per se* price-fixing in violation of the Sherman Act. The court therefore determined that insofar as it applied to contract rates, the Settlement Agreement was "illegal and unenforceable." FEC subsequently agreed to the dismissal of its Count III monopolization claim with prejudice and filed this appeal. CSX cross appeals, contesting the court's finding that the Settlement Agreement applies to contract rates.

## II.

■ Our first task, then, must be to determine whether the Settlement Agreement applies to contract rates, because only if it does would there be a potential Sherman Act violation. The construction of a contract is a question of law that is subject to de novo review. *Vernon v. Resolution Trust Corp.*, 907 F.2d 1101, 1109 (11th Cir.1990); *DEC Elec., Inc. v. Raphael Constr. Corp.*, 558 So.2d 427, 428 (Fla.1990); *Royal Oak Landing Homeowners Ass'n, Inc. v. Pelletier*, 620 So.2d 786, 788 (Fla.Dist.Ct.App.1993). The Settlement Agreement provides that it is to be governed by Florida law. (Settlement Agreement ¶ DD.)

The district court determined that the term "rates" as used in Paragraph J was unambiguous. Citing *The Random House Dictionary* and the Interstate Commerce Act, the court found that given its "plain and ordinary" meaning, the term referred in general to a charge for transportation. Feb. 19, 1993 Mem.Op. at 19. Relying on the principle that "[w]here the language of a contract is clear and unambiguous, the court can give to it no meaning other than that expressed" (*id.* at 20 (quoting *Paddock v. Bay Concrete Industries, Inc.*, 154 So.2d 313, 316 (Fla.Dist. Ct.App.1963))), the district court concluded

---

4. Despite finding that the parties had not presented a justiciable controversy as to contract rates and therefore declining to address the Sherman Act question, the court did express its view that the Settlement Agreement applied to contract rates. Because the court ultimately found that it lacked jurisdiction over the issue, however, its interpretation of the Settlement Agreement has no preclusive effect here.

that the term must be read to include contract rates.

We disagree. Although unambiguous contract language must indeed be interpreted without resort to extrinsic evidence, it is not to be interpreted in a vacuum. A court's underlying goal when interpreting a contract must always be to ascertain the intent of the parties. As the Supreme Court of Florida has explained, "the great object, and practically the only foundation, of rules for the construction of contracts, is to arrive at the intention of the parties." *Underwood v. Underwood,* 64 So.2d 281, 288 (Fla.1953) (emphasis omitted) (quoting *St. Lucie County Bank & Trust Co. v. Aylin,* 94 Fla. 528, 114 So. 438, 441 (1927) (internal quotations omitted)); *see also Morris v. Federated Mutual Ins. Co.,* 497 F.2d 538, 540 (5th Cir.1974) ("The cardinal rule under Florida law for construction of a contract is to ascertain and give effect to the mutual intentions of the parties."); *Coffin v. Coffin,* 368 So.2d 105, 107 (Fla.Dist.Ct.App.1979). Unambiguous language precludes resort to extrinsic evidence, therefore, because unambiguous language provides the best evidence of the parties' intent at the time they executed the contract. *Royal Oak Landing,* 620 So.2d at 788 ("[T]he intentions of the parties to a contract govern its construction and interpretation. When determining intent, the best evidence is the plain language of the contract."); *Terex Trailer Corp. v. McIlwain,* 579 So.2d 237, 242 (Fla.Dist.Ct.App.1991); *Ware v. Money-Plan Int'l, Inc.,* 467 So.2d 1072, 1073 (Fla.Dist.Ct.App.1985); *see also American Home Assurance Co. v. Larkin General Hosp., Ltd.,* 593 So.2d 195, 197 (Fla. 1992).

But the language of a contract cannot be properly understood if it is read without attention to the circumstances under which it was written. Instead, "words in a contract should be given their natural meaning or the meaning most commonly understood in relation to the subject matter and circumstances." *Gamble v. Mills,* 483 So.2d 826, 829 (Fla.Dist.Ct.App.1986); *see also Gibbs v. Air Canada,* 810 F.2d 1529, 1533 (11th Cir. 1987); *Morris,* 497 F.2d at 540. As the Supreme Court of Florida has more than once explained:

"In the construction of written contracts it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed.... Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish."

*Underwood,* 64 So.2d at 288 (emphasis omitted) (quoting *St. Lucie County Bank & Trust Co.,* 114 So. at 441 (internal quotations omitted)); *see also Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.,* 302 So.2d 404, 407 (Fla.1974); *Shuford Dev. Co. v. Chrysler Corp.,* 449 F.2d 429, 432 (5th Cir.1971) (In ascertaining the mutual intention of the parties, the court should "place itself as nearly as possible in the position of the parties when their minds met on the terms of the contract, and in the light of the language of the contract, itself, and the facts and circumstances surrounding, leading up to, and attendant with its execution, arrive at and give effect to such mutual intent.").

Beginning with the broader context, the legal framework that existed at the time of a contract's execution must bear on its construction. Contracts are presumed to be written in contemplation of the existing applicable law. *Belcher v. Belcher,* 271 So.2d 7, 9 (Fla.1972); *Southern Crane Rentals, Inc. v. City of Gainesville,* 429 So.2d 771, 773 (Fla.Dist.Ct.App.1983); *see also Gordon v. State,* 608 So.2d 800, 802 (Fla.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1647, 123 L.Ed.2d 268 (1993); *City of Daytona Beach v. Amsel,* 585 So.2d 1044, 1046 (Fla.Dist.Ct. App.1991); *Oakbrooke Assoc., Ltd v. Insurance Comm'r of California,* 581 So.2d 943, 946 (Fla.Dist.Ct.App.1991). Specifically, parties are assumed to have contracted with reference to those statutory provisions that relate to the subject matter of their contract. *Florida Beverage Corp. v. Division of Alcoholic Beverages and Tobacco,* 503 So.2d 396,

398 n. 1 (Fla.Dist.Ct.App.1987) ("[T]he laws with reference to which the parties must be assumed to have contracted were those which in their direct or necessary legal operation controlled or affected the obligations of the contract.") (emphasis omitted) (quoting *General Dev. Corp. v. Catlin,* 139 So.2d 901, 903 (Fla.Dist.Ct.App.1962)). And a subsequent change in the law cannot retrospectively alter the parties' agreement. *Florida Beverage Corp.,* 503 So.2d at 398. Whereas the law in effect at the time of execution sheds light on the parties intent, subsequent changes in the law that are not anticipated in the contract generally have no bearing on the terms of their agreement.

Here, the surrounding legal context supports the conclusion that the parties did not understand the term "rates" to include contract rates when they executed the Settlement Agreement. It is undisputed that contract rates were illegal prior to the 1980 passage of the Staggers Rail Act.[5] When the Settlement Agreement was executed in 1978, rates were set only by way of published tariff, and the Agreement must be interpreted against that legal backdrop. We must assume that when using the term "rates," the parties meant only that form of "rate" that was legal at the time—published tariffs. Rates that were illegal at the time presumably were, in the absence of any indication to the contrary, outside of the parties' contemplation.

The circumstances more directly surrounding the negotiation and execution of the Settlement Agreement provide an even stronger basis for a narrow reading of the term "rate." The Settlement Agreement arose out of and in settlement of FEC's 1978 ICC

action, which was based on SCL's alleged failure to abide by the 1963 merger conditions. When it filed that action, FEC was entitled only to the benefit of the conditions that had been imposed on the 1963 merger, and its presumable goal was nothing more than SCL's compliance with those conditions. In other words, the most that FEC could have achieved if its complaint had been fully adjudicated by the ICC would have been the benefits that had been conferred by the 1963 merger conditions. And it is undisputed that the merger conditions themselves did not cover contract rates. As the district court found:

> The evidence of ICC regulatory practice indicates that the ICC does not regard the merger conditions as extending to contract rates. The merger conditions in general, and the rate equalization requirement, are inconsistent with contract ratemaking. Representatives from both parties acknowledged prior to trial that the merger conditions did not apply to contract rates.

(Feb. 19, 1993 Mem.Op. at 14–15 ¶ 22.).[6] Thus, FEC had no right to and presumably no intention of attaining rate equalization as to contract rates when it filed the 1978 complaint. Assuming rational behavior on the part of SCL, it is not reasonable to read the Settlement Agreement as requiring more than FEC could have achieved if the dispute had been fully adjudicated. The circumstances surrounding the genesis of the Settlement Agreement therefore strongly suggest that the parties did not intend the term "rates" as used therein to have a meaning broader than that originally embodied in the merger conditions.[7]

5. FEC has attempted to confuse this otherwise undisputed fact by asserting in its responsive brief and at oral argument that contract rates were not in fact illegal prior to the passage of the Staggers Act, but "merely had to be published as tariffs before they could be enforceable." (FEC Responsive Brief at 39.) True, published tariffs may have been determined initially by way of private negotiation, but such rates were nonetheless tariffs and operated as any other tariff once published. We use the term contract rates in reference to privately negotiated rates that remain private and that are not subsequently published as generally applicable tariffs. Such rates

became legal only after passage of the Staggers Act.

6. The appellant does not challenge the district court's factual findings on appeal. (*See* FEC Brief at 19.)

7. The fact that the Settlement Agreement was meant to do no more than settle the ICC litigation is clear from this statement in its preface:
   In settlement of certain litigation between them pending before the Interstate Commerce Commission in Finance Docket No. 21215 and consolidated dockets, Seaboard Coast Line Railroad Company (SCL) and Florida East

The stated purpose of the Settlement Agreement affirms that view:

> It is agreed that the overall intent and purpose of this Agreement is to reaffirm Conditions 1 through 6 prescribed in the *SAL/ACL Merger* case, 320 I.C.C. 122, 267, and to provide by this Agreement additional provisions to govern the relationship between SCL and FEC only, in the light of those conditions.

(Settlement Agreement at 1.)[8]

The same conclusion is also supported by the language employed in Paragraph J itself to set out the rate equalization requirement. The paragraph requires that "[w]henever SCL establishes routes and rates ... it will also establish routes and rates on the same basis to or from any point served by FEC...." This language certainly does not on its face suggest applicability to contract rates, which are not unilaterally "established" but negotiated with another party. And that distinction is practical as well as semantic. As the district court noted:

Problems of administration arise if the Settlement Agreement is applied to contract rates. A published single-line tariff rate is available to all shippers. A corresponding published CSXT/FEC joint-line tariff rate is also available to all shippers, and standard divisions apply. "Divisions" are agreements among railroads for the apportionment of charges paid by shippers for joint-line service. Contract rates, however, are the product of confidential negotiations, are kept private, and are not made subject to standard divisions.

(Feb. 19, 1993 Mem.Op. at 15 ¶ 23).[9] In other words, because the Settlement Agreement fails to address the practicalities of rate equalization in the context of privately negotiated contract rates, it cannot easily be transplanted from the old world to the new. The absence of any provision for the Agreement's application to contract rates stands in stark contrast to the extreme detail in which the practical aspects of the Agreement's ap-

---

> Coast Railway Company (FEC) hereby covenant and agree as follows:

(Settlement Agreement at 1.) The Agreement also provides:

> FEC agrees that it will dismiss with prejudice its Complaint against all Defendants in ICC Finance Docket No. 28417, its Petition for Reopening and for Modification of Protective Conditions in Finance Docket No. 22215, and all other pleadings seeking relief in these and all consolidated dockets (collectively the "ICC Proceeding").

(*Id.* at ¶ P.)

**8.** *See Gibbs,* 810 F.2d at 1533 ("[T]he language being construed should be read in common with the other provisions of the contract."); *Royal Oak Landing,* 620 So.2d at 788.

FEC argues that a contrary result is suggested by this passage, which immediately follows the above-quoted portion of the Agreement's statement of purpose:

> In interpreting the substantive provisions of this Agreement, it shall be borne in mind that it is the intent of the parties that SCL will not take steps to place FEC in a position so that it cannot fairly compete with SCL on an equal basis on traffic destined to the South Florida area ... served by them both and that SCL will, insofar as it is within the power of the SCL to do so, take the steps specified herein so that FEC may fairly compete with SCL to such area....

(Settlement Agreement at 1–2.) FEC argues that if the Settlement Agreement is not read to cover

contract rates, FEC will not receive the benefit of its bargain with CSX, which, as evidenced by this passage, was the assurance of equalized rates. True, FEC will lose the shelter provided by the merger conditions and the Settlement Agreement in the new world of contract rates. But that does not mean that it prospectively bargained for such protection when it negotiated the Settlement Agreement. This portion of text must be read in light of and as limited by the one that immediately precedes it. As discussed above, that passage makes clear that the Settlement Agreement is a direct descendent of the merger conditions, and common sense precludes a different reading in light of the circumstances that gave rise to the Agreement. The language "will not take steps to place FEC in a position so that it cannot fairly compete with SCL on an equal basis" as well as the language "to provide ... additional provisions to govern the relationship ..." can both be understood as references to the provisions that follow, which address quite specifically the practicalities of the Agreement's application as to particular trains, routes and interchanges. (*See* Settlement Agreement ¶¶ A–I, K–N.)

**9.** The district court also found that "Contract rates are inconsistent with rate equalization because railroads may now enter into private unpublished contracts with shippers, and railroads may offer rebates. At the time the Settlement Agreement was executed, rebating was a form of 'discrimination' and was regarded by the parties as illegal." (*Id.* at ¶ 25.)

plication are otherwise set out.[10] The use of the term "establish" and the fact that the Settlement Agreement does not provide any practical basis for its application to negotiated contract rates supports the conclusion that the Agreement is not properly understood to cover rates in general without regard to the form they take. Paragraph J should not be read to cover a type of rate to which it could not be applied without modification.

Ironically, this lawsuit itself exemplifies a significant unprovided-for problem that arises if the Settlement Agreement is applied to contract rates. The fact that the merger conditions do not apply to contract rates means that the antitrust immunity conferred by those conditions also does not extend to contract rates. As evidenced by this lawsuit, there is serious question in the absence of such immunity about the legality of rate equalization under Section 1 of the Sherman Act. Although we need not reach that question here in light of our construction of the Settlement Agreement, the fact that the Agreement in no way anticipates this problem, which would clearly arise if the Agreement were applied to contract rates, supports our conclusion that the parties did not contemplate the Agreement's application in this context.[11]

### III.

We therefore find that the Settlement Agreement does not apply to contract rates. We need not address the antitrust questions that would arise if it did. The judgment of the district court is AFFIRMED.

---

10. See, e.g., Settlement Agreement ¶¶ A–I, K–N.

11. Although we find the contractual language to be unambiguous and therefore subject to interpretation without resort to extrinsic evidence, we note nonetheless that our inference regarding the parties' understanding is consistent with the district court's factual finding that:

    The parties discussed antitrust ramifications of the Settlement Agreement. FEC's Thornton and SCL's Lyons questioned whether the Set-

tlement Agreement could constitute illegal price fixing. The parties intended to preserve the antitrust immunity that had attached to the merger conditions.

(Feb. 19, 1993 Mem.Op. at 14 ¶ 19.) Clearly, if the parties intended the antitrust immunity to extend to the Settlement Agreement, they could not simultaneously have intended the Settlement Agreement to extend beyond the scope of that immunity.