In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-2196

VERONICA PRICE, et al.,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 16-cv-8268 — **Amy J. St. Eve**, *Judge*.

_____

ARGUED FEBRUARY 13, 2018 — DECIDED FEBRUARY 13, 2019

_____

Before SYKES and BARRETT, *Circuit Judges*, and GRIESBACH, *Chief District Judge*.*

SYKES, *Circuit Judge*. Pro-life "sidewalk counselors" sued to enjoin Chicago's "bubble zone" ordinance, which bars them from approaching within eight feet of a person in the vicinity of an abortion clinic if their purpose is to engage in

_____

* Of the Eastern District of Wisconsin, sitting by designation.

counseling, education, leafletting, handbilling, or protest. The plaintiffs contend that the floating bubble zone is a facially unconstitutional content-based restriction on the freedom of speech. The district judge dismissed the claim, relying on *Hill v. Colorado*, 530 U.S. 703 (2000), which upheld a nearly identical Colorado law against a similar First Amendment challenge.

Abortion clinic buffer-zone laws "impose serious burdens" on core speech rights. *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014). Under *Hill*, however, a floating bubble zone like this one is not considered a content-based restriction on speech and thus is not subject to strict judicial scrutiny. 530 U.S. at 725. Rather, the ordinance is classified as a content-neutral "time, place, or manner" restriction and is tested under the intermediate standard of scrutiny, which asks whether the law is narrowly tailored to serve significant governmental interests. *Id.* at 725–26. *Hill* answered that question in the affirmative, holding that the governmental interests at stake—preserving clinic access and protecting patients from unwanted speech—are significant, and an 8-foot no-approach zone around clinic entrances is a narrowly tailored means to address those interests. *Id.* at 716, 725–30.

*Hill*'s content-neutrality holding is hard to reconcile with both *McCullen* and *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), and its narrow-tailoring holding is in tension with *McCullen*. Still, neither *McCullen* nor *Reed* overruled *Hill*, so it remains binding on us. Moreover, Chicago's bubble-zone law is narrower than the one upheld in *Hill*: Colorado's no-approach zone applies within a 100-foot radius of a clinic entrance; Chicago's applies within a 50-foot radius. Lastly,

we would open a circuit split if we allowed this facial challenge to move forward. The Third Circuit, applying *Hill*, upheld Pittsburgh's 8-foot bubble zone against a facial challenge without requiring an evidentiary showing from the City. *See Brown v. City of Pittsburgh*, 586 F.3d 263, 270–73 (3d Cir. 2009). We affirm the judgment.

## I. Background

The case comes to us from a dismissal at the pleading stage, so we sketch the facts as alleged in the plaintiffs' complaint, accepting them as true for purposes of this appeal. *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498, 499 (7th Cir. 2018). Pro-life advocates Veronica Price, David Bergquist, Ann Scheidler, and Anna Marie Scinto Mesia regularly engage in what's known as "sidewalk counseling" on the sidewalks and public ways outside Chicago abortion clinics. This entails peacefully approaching women entering the clinics to give them pro-life literature, discuss the risks of and alternatives to abortion, and offer support if the women were to carry their pregnancies to term. These conversations must take place face to face and in close proximity to permit the sidewalk counselors to convey a gentle and caring manner, maintain eye contact and a normal tone of voice, and protect the privacy of those involved.

In October 2009 the Chicago City Council adopted an ordinance that effectively prohibits sidewalk counseling by banning the close approach it requires. The Council amended the City's disorderly conduct ordinance to prohibit any person from approaching within eight feet of another person near an abortion clinic for the purpose of engaging in the types of speech associated with sidewalk counseling. The ordinance provides:

> A person commits disorderly conduct when he … knowingly approaches another person within eight feet of such person, unless such other person consents, *for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way* within a radius of 50 feet from any entrance door to a hospital, medical clinic or healthcare facility … .

CHI., ILL., CODE § 8-4-010(j)(1) (2009) (emphasis added). Chicago's ordinance is nearly identical to—indeed, was modeled after—the Colorado law upheld in *Hill*. Both laws impose an 8-foot no-approach bubble zone, but Chicago's law operates within a smaller radius. Colorado's 8-foot bubble zone applies within a 100-foot radius of an abortion-clinic entrance. Chicago's applies within a 50-foot radius. The City's ordinance otherwise mirrors the law at issue in *Hill*.

In August 2016 the four sidewalk counselors and two advocacy groups joined together to sue the City under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against the enforcement of the bubble-zone ordinance. Their complaint raised four claims: (1) the ordinance infringes the freedom of speech guaranteed by the First Amendment, both facially and as applied; (2) the ordinance is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment; (3) the City selectively enforces the bubble-zone ordinance in violation of the Equal Protection Clause of the Fourteenth Amendment; and (4) the ordinance infringes the plaintiffs' state constitutional right to freedom

of speech and assembly. Much of the complaint describes specific instances of selective or improper enforcement from early 2010 through mid-2016, but those allegations have no bearing on this appeal.

The City moved to dismiss the complaint for failure to state a claim. *See* FED. R. CIV. P. 12(b)(6). The district judge granted the motion in part. She ruled that *Hill* forecloses the facial First Amendment challenge and the due-process vagueness claim. But she allowed the case to proceed on the as-applied First Amendment challenge, the equal-protection claim alleging selective enforcement, and the state constitutional claims. The parties eventually settled these remaining claims and jointly moved to dismiss them. The judge entered final judgment, setting up this appeal contesting only the Rule 12(b)(6) ruling.

## II. Discussion

We review a Rule 12(b)(6) dismissal de novo. *O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 342 (7th Cir. 2018). The plaintiffs contend that Chicago's bubble-zone ordinance is a content-based restriction on speech and is facially unconstitutional under strict scrutiny. Their fallback position is that the ordinance flunks the narrow-tailoring requirement of the intermediate test for content-neutral restrictions on speech.

The Supreme Court considered and rejected these precise arguments in *Hill*, as the plaintiffs must and do acknowledge. As they see it, however, *Hill* is no longer an insuperable barrier to suits challenging abortion clinic bubble-zone laws. The premise of their claim is that the Court's more recent decisions in *Reed* and *McCullen* have so

thoroughly undermined *Hill*'s reasoning that we need not follow it.

That's a losing argument in the court of appeals. The Court's intervening decisions have eroded *Hill*'s foundation, but the case still binds us; only the Supreme Court can say otherwise. *See State Oil Co. v. Kahn*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."). The Court's instructions in this situation are clear: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case [that] directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237–38 (1997) (quotation marks omitted).

That said, in the nineteen years since *Hill* was decided, the Court has refined the concept of content neutrality and clarified the requirement of narrow tailoring in a First Amendment challenge of this type. To see how, it's helpful to trace the doctrinal development in this specific corner of free-speech law.

## A. Speech in a Traditional Public Forum

We begin with first principles. "The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation marks omitted). "Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment … ." *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997). Moreover, sidewalks and other public ways "occupy a special

position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen*, 134 S. Ct. at 2529 (quotation marks omitted). These public spaces—"traditional public fora" in the doctrinal nomenclature—"have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939).

As the Court explained in *McCullen*:

> It is no accident that public streets and side-walks have developed as venues for the exchange of ideas. Even today, they remain one of the few places where a speaker can be confident that he is not simply preaching to the choir. With respect to other means of communication, an individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site. Not so on public streets and sidewalks. There, a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, this aspect of traditional public fora is a virtue, not a vice.

134 S. Ct. at 2529 (citation and quotation marks omitted). Thus, speech "is at its most protected on public sidewalks." *Schenck*, 519 U.S. at 377.

That the sidewalk counselors seek to reach women as they enter an abortion clinic—at the last possible moment when their speech might be effective—"only strengthens the protection afforded [their] expression." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). "Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed. No form of speech is entitled to greater constitutional protection … ." *Id.* (citation omitted). And direct "one-on-one communication" has long been recognized as "the most effective, fundamental, and perhaps economical avenue of political discourse." *McCullen*, 134 S. Ct. at 2536 (quotation marks omitted).

*          *          *

It is a "guiding First Amendment principle that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," and this principle "applies with full force in a traditional public forum." *Id.* at 2529 (quotation marks omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional" and get strict judicial scrutiny; laws of this type "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226.

On the other hand, the government has "somewhat wider leeway to regulate features of speech unrelated to its content." *McCullen*, 134 S. Ct. at 2529. "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content

of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation marks omitted).

To date, the Supreme Court has applied the intermediate standard of scrutiny to abortion-clinic buffer zones, with mixed results. We now turn to those cases.

## B. The Abortion Clinic Buffer-Zone Cases

### 1. *Madsen v. Women's Health Center* and *Schenck v. Pro-Choice Network of Western New York*

The Court's first two occasions to address abortion-clinic buffer zones came in cases involving injunctions entered by state and federal courts to address unlawful conduct associated with the large-scale clinic blockades of the early 1990s for which ordinary law-enforcement responses had proven ineffective. *Schenck*, 519 U.S. at 362–63 (describing the clinic blockades); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 758–59 (1994) (same).

In *Madsen* the Court reviewed a state-court injunction barring the named defendants from entering a 36-foot buffer zone around a particular clinic. 512 U.S. at 760. As relevant here, the injunction also established a 300-foot zone around the clinic within which the defendants were prohibited from "physically approaching any person seeking the services of the [c]linic" without that person's consent. *Id.* The Court first ruled that these restrictions were content neutral and did not require strict scrutiny. *Id.* at 762–64. However, the Court applied a "more stringent" form of intermediate scrutiny because injunctions "carry greater risks of censorship and

discriminatory application than do general ordinances." *Id.* at 764–65. This yielded a split result: The Court upheld the fixed 36-foot buffer zone but invalidated the floating "no approach" zone. *Id.* at 768–70, 773–74.

In *Schenck* the Court applied *Madsen* and upheld a provision in a federal-court injunction prohibiting the named defendants from entering a fixed 15-foot buffer zone around the doorways, driveways, and parking lots of certain abortion clinics. 519 U.S. at 380–83. But the Court invalidated a provision barring the defendants from approaching within 15 feet of any person entering or leaving the clinics. *Id.* at 377–79. The Court held that the 15-foot floating bubble zone was unconstitutional because it prevented the defendants "from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who [were] walking on the public sidewalks." *Id.* at 377.

The Court's reasoning rested primarily on the venerable principle that leafletting on public sidewalks is core protected speech. "Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." *Id.* But the Court was also concerned that the floating bubble zone was not narrowly tailored: "With clinic escorts leaving the clinic to pick up incoming patients and entering the clinic to drop them off, it would be quite difficult for a protester who wishes to engage in peaceful expressive activity to know how to remain in compliance with the injunction," resulting in "substantial risk that much more speech will be burdened than the

injunction by its terms prohibits." *Id.* at 378. The Court reserved the question "whether the governmental interests involved would *ever* justify some sort of zone of separation between individuals entering the clinics and protesters, measured by the distance between the two." *Id.* at 377 (emphasis added).

### 2. *Hill v. Colorado*

The Court returned to this subject in *Hill*, this time reviewing a generally applicable law rather than a targeted injunction. As we've noted, Chicago's bubble ordinance is identical to the Colorado law at issue in *Hill* except for the radius within which the no-approach zone applies. Because *Hill* is decisive here, the decision merits close review.

The Court began with the question of content neutrality, observing that the 8-foot bubble zone "is not a regulation of speech" but instead is simply "a regulation of the places where some speech may occur." *Hill*, 530 U.S. at 719. And the Colorado law, the Court said, was not content based because it "was not adopted because of disagreement with the message the speech conveys" but rather to ensure clinic access, protect patient privacy, and "provid[e] the police with clear guidelines." *Id.* at 719–20 (quotation marks and alteration omitted).

The challengers argued that the law was content based because enforcement authorities would have to examine the content of the statements made by an approaching speaker to determine if a violation of the statute occurred. *Id.* at 720. The Court disagreed, saying that the law "places no restriction on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by

a speaker. Rather, it simply establishes a minor place restriction on an extremely broad category of communications with unwilling listeners." *Id.* at 723. The Court added: "[W]e have never suggested that the kind of cursory examination that might be required to exclude casual conversation … would be problematic." *Id.* at 722. On these understandings, the Court ruled that the bubble-zone law was properly classified as a content-neutral time, place, or manner regulation of speech and did not require strict scrutiny. *Id.* at 725.

Applying intermediate scrutiny, the Court held that Colorado's objectives—preserving clinic access and protecting patients from unwelcome speech—count as significant governmental interests, and an 8-foot floating bubble zone within 100 feet of a clinic entrance is a narrowly tailored means to serve them. *Id.* at 726–30. The Court distinguished the Colorado law from the no-approach zone it had invalidated just three years earlier: "Unlike the 15-foot zone in *Schenck*, this 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" *Id.* at 726–27 (quoting *Schenck*, 519 U.S. at 377)). The Court acknowledged that the "burden on the ability to distribute handbills is more serious," but that difficulty did not doom the Colorado law. *Id.* at 727. The 8-foot buffer zone, the Court said, did not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians [could] easily accept." *Id.*

Rounding out its narrow-tailoring analysis, the Court rejected the argument that Colorado could achieve its objectives through less restrictive means—say by enforcing its preexisting laws against harassment, disorderly conduct, and battery, as Justice Kennedy posited in dissent. *Id.* at 729;

*id.* at 777–78 (Kennedy, J., dissenting). As the Court put it, the statute's "prophylactic aspect" was justified based on the "great difficulty" of protecting abortion clinics and their patients via "legal rules that focus exclusively on the individual impact of each instance of behavior." *Id.* at 729.

### 3. *McCullen v. Coakley*

*Hill* was decided in 2000. No new buffer-zone case reached the Court until *McCullen* in 2014. At issue was a Massachusetts law imposing a fixed 35-foot buffer zone around the entrance, exit, and driveway of every abortion clinic in the state. *McCullen*, 134 S. Ct. at 2526. Certain persons were exempt and could freely enter the zone: those entering or leaving the clinic; employees or agents of the clinic; law enforcement, firefighters, construction and utility workers, and other municipal agents; and persons using the sidewalk or public way to reach a destination other than the clinic. Everyone else was kept out on pain of criminal penalty. *Id.*

As here, pro-life sidewalk counselors challenged the law. *Id.* at 2527. They argued that the buffer-zone law was a content-based restriction on speech and required strict scrutiny. The Court disagreed. First, the Court noted that "the Act does not draw content-based distinctions on its face." *Id.* at 2531. To be sure, the Court explained, the Massachusetts law "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *Id.* (quotation marks omitted). But enforcement of the law turned not on what people said while in the buffer zone "but simply on where they sa[id] it." *Id.* "Indeed," the Court said, "[a person could] violate the Act merely by

standing in a buffer zone, without displaying a sign or uttering a word." *Id.*

The Court continued:

> To be clear, the Act would not be content neutral if it were concerned with [the] undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech. … If, for example, the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech.

*Id.* at 2531–32 (citation, quotation marks, and alteration omitted). In the end the Court concluded that the justifications for the law—"ensuring safety and preventing obstruction" at clinic entrances—"are, as a general matter, content neutral." *Id.* at 2532.

But the Massachusetts buffer-zone law did not survive intermediate scrutiny. Citing *Schenck* and *Madsen* (but not *Hill*), the Court held that the Commonwealth's safety and access objectives were sufficiently weighty under the intermediate standard of review. *Id.* at 2535. "At the same time," however, "the buffer zones impose serious burdens on [the sidewalk counselors'] speech." *Id.* Relying again on *Schenck*, the Court observed that the fixed 35-foot buffer zone made it "substantially more difficult" for sidewalk counselors to "distribute literature to arriving patients" and to engage in the kind of personal and compassionate conversations required for their messages to be heard. *Id.* at 2536.

Amplifying the theory behind the intermediate standard of scrutiny, the Court significantly clarified the role of the narrow-tailoring requirement:

> The tailoring requirement does not simply guard against an impermissible desire to censor. The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency.

*Id.* at 2534 (quotation marks and alteration omitted). In other words, "[f]or a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 2535 (quoting *Ward*, 491 U.S. at 799). Put in more positive terms, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve [its] interests, not simply that the chosen route is easier." *Id.* at 2540.

Against these background principles of narrow tailoring, the 35-foot fixed buffer zone flunked the test. "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.* Massachusetts had less restrictive regulatory options to ensure access to abortion clinics and prevent harassment of patients: existing

state and local laws banning obstruction of clinic entrances; "generic criminal statutes forbidding assault, breach of the peace, trespass, vandalism, and the like"; and targeted injunctions like those in *Schenck* and *Madsen*. *Id.* at 2538. But the Commonwealth had not shown that "it seriously undertook to address the problem with less intrusive tools readily available to it." *Id.* at 2539.

"Given the vital First Amendment interests at stake, it is not enough for Massachusetts simply to say that other approaches have not worked." *Id.* at 2540. The Court concluded that "[t]he buffer zones burden substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* at 2537.

The Court closed with this:

> [The sidewalk counselors] wish to converse with their fellow citizens about an important subject on the public streets and sidewalks— sites that have hosted discussions about the issues of the day throughout history. [Massachusetts] assert[s] undeniably significant interests in maintaining public safety on those same streets and sidewalks, as well as in preserving access to adjacent healthcare facilities. But here the Commonwealth has pursued those interests by the extreme step of closing a substantial portion of a traditional public forum to all speakers. It has done so without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes. The Commonwealth may not do that consistent with the First Amendment.

*Id.* at 2541.

### 4. *Reed v. Town of Gilbert*

One more case is important to the current doctrinal land-scape, though it did not involve an abortion-clinic buffer zone. *Reed* was a First Amendment challenge to the Sign Code in the Town of Gilbert, Arizona, which classified signs by the type of information they conveyed and regulated each category differently. 135 S. Ct. at 2224–25. For example, "Ideological Signs"—defined as any sign "communicating a message or idea[] for noncommercial purposes" other than construction signs, directional signs, and certain other categories—were treated most favorably. *Id.* at 2224. "Political Signs"—any "temporary sign designed to influence the outcome of an election"—were treated less favorably than Ideological Signs. *Id.* "Temporary Directional Signs" were regulated most heavily. *Id.* at 2225.

The Court began with an important clarification of the content-neutrality inquiry. First, a "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message conveyed." *Id.* at 2227. The Court explained that the threshold question in the test for content neutrality is whether the challenged regulation "on its face draws distinctions based on the message a speaker conveys." *Id.* (quotation marks omitted). The Court continued: "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys" and require strict scrutiny. *Id.*

The Court then identified a "separate and additional cat-egory of laws that, *though facially content neutral*, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech[] or … were adopted by the government because of disagreement with the message the speech con-veys." *Id.* (emphasis added) (quotation marks and alteration omitted). Laws of this type also get strict judicial scrutiny. *Id.* at 2227.

On this illumination of the concept of content neutrality, the Court ruled that the Town's Sign Code "is content based on its face." *Id.* The Town's regulatory requirements for "any given sign … depend entirely on the communicative content of the sign." *Id.* As the Court put it:

> If a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign ex-pressing an ideological view rooted in Locke's theory of government.

*Id.*

The Town insisted that strict scrutiny did not apply be-cause it had not discriminated between particular ideas or viewpoints within each sign category. The Court resound-ingly rejected that position: "A law that is content based on its face is subject to strict scrutiny regardless of the govern-ment's benign motive, content-neutral justification, or lack of

animus toward the ideas contained in the regulated speech." *Id.* at 2228 (quotation marks omitted). Put somewhat more directly: "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230.

The Town could not defend its Sign Code under strict scrutiny. The Court assumed for the sake of argument that the Town's objectives—aesthetics and traffic safety—were compelling enough to satisfy this most exacting standard of review. *Id.* at 2231. But the Code's content-based distinctions were "hopelessly underinclusive." *Id.* The Town could not explain how its interests in beautification and safety were furthered by strictly limiting temporary directional signs but allowing other types of signs to proliferate. *Id.* "In light of this underinclusiveness," the Court held, "the Town has not met its burden to prove that its Sign Code is narrowly tailored to further a compelling governmental interest." *Id.* at 2232.

## C. *Hill* After *Reed* and *McCullen*

*Hill* is incompatible with current First Amendment doctrine as explained in *Reed* and *McCullen*. To begin, *Hill* started from the premise that "[t]he principal inquiry in determining content neutrality … is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." 530 U.S. at 719 (quoting *Ward*, 491 U.S. at 791). After *Reed* that's no longer correct. We now know that the first step in the content-neutrality inquiry is to ask whether the challenged law is "content based on its face." *Reed*, 135 S. Ct. at 2228.

As *Reed* explained, a "*separate* and *additional* category" of content-based laws includes facially neutral laws that "cannot be justified without reference to the content of the regulated speech[] or … were adopted because of disagreement with the message the speech conveys." *Id.* at 2227 (emphases added) (quotation marks and alteration omitted). But "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* at 2228. "Because strict scrutiny applies *either* when a law is content based on its face *or* when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* (emphases added).

In fairness, *Hill* did not completely ignore the actual text of the Colorado statute. Though not clearly delineated, its facial analysis was twofold. The Court first concluded that Colorado's bubble-zone law was content neutral because it didn't restrict "either a particular viewpoint or any subject matter that may be discussed by a speaker." *Hill*, 530 U.S. at 723. In other words, the absence of viewpoint or subject-matter discrimination was a sufficient indicator of content neutrality. Second, the Court dismissed the fact that enforcement authorities had to examine the content of an approaching speaker's statements to determine if a violation of the law had occurred: "We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Id.* at 721.

Neither rationale survives *McCullen* and *Reed*. *McCullen* explained in no uncertain terms that a law is indeed content

based if enforcement authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred." 134 S. Ct. at 2531 (quotation marks omitted). And *Reed* clarified that the lack of viewpoint or subject-matter discrimination does not spare a facially content-based law from strict scrutiny. 135 S. Ct. at 2230. As we explained shortly after *Reed* was decided, the Court has "effectively abolishe[d] any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015). In the wake of *McCullen* and *Reed*, it's not too strong to say that what *Hill* explicitly rejected is now prevailing law.

There is more. *Reed* explained that a law is content based if it draws "more subtle" facial distinctions like those that "defin[e] regulated speech by its function or purpose." 135 S. Ct. at 2227. By its terms, the law upheld in *Hill* regulates speech undertaken "for the *purpose* of … engaging in oral protest, education, or counseling." 530 U.S. at 707 (emphasis added) (quotation marks omitted). And divining purpose clearly requires enforcement authorities "to examine the content of the message that is conveyed." *McCullen*, 134 S. Ct. at 2531 (quotation marks omitted). How else could the authorities distinguish between a sidewalk counselor (illegal) and a panhandler, a pollster, or a passerby who asks for the time (all legal)?

Here's another incongruity between *Hill* and the Court's current jurisprudence. *McCullen* emphasized that a law is content based if it is "concerned with [the] undesirable effects that arise from the direct impact of speech on its

audience or listeners' reactions to speech." 134 S. Ct. at 2531–32 (quotation marks and alteration omitted). Yet *Hill* repeatedly cited concern for listeners' reactions as an *acceptable justification* for Colorado's bubble-zone law. True, the Court also mentioned concerns about clinic access and safety, but that does not diminish its emphasis on Colorado's interest in "protect[ing] listeners from unwanted communication" and safeguarding the right "to be let alone." 530 U.S. at 715–16, 724 (quotation marks omitted). Indeed, the Court highlighted the "emotional harm suffered when an unwelcome individual delivers a message … at close range." *Id.* at 718 n.25. The bubble-zone law upheld in *Hill* was aimed in substantial part at guarding against the undesirable effects of the regulated speech on listeners. After *McCullen* that's not a content-neutral justification.

Finally, *Hill*'s narrow-tailoring analysis conflicts with *McCullen*'s insistence that "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve [its] interests, not simply that the chosen route is easier." 134 S. Ct. at 2540. Recall *McCullen*'s exhortation against the use of broad prophylactic regulations in speech-sensitive zones: "A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency. … Given the vital First Amendment interests at stake, it is not enough for Massachusetts simply to say that other approaches have not worked." *Id.* In stark contrast, *Hill* specifically *approved* the "bright-line prophylactic" aspect of Colorado's bubble-zone law *precisely because* other less restrictive measures—e.g., laws against harassment and breach of the peace—were harder to enforce. 530 U.S. at 729.

In short, *McCullen* and *Reed* have deeply shaken *Hill*'s foundation. Yet the case remains on the books and directly controls here. The plaintiffs urge us to follow the Third Circuit's lead in *Bruni v. City of Pittsburgh*, which reversed the dismissal of a challenge to Pittsburgh's fixed 15-foot clinic buffer zone and remanded for a case-specific narrow-tailoring analysis in light of *McCullen*. 824 F.3d 353, 372–73 (3d Cir. 2016). The court held that dismissal at the pleading stage was improper based on *McCullen*'s "important clarification of the rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis." *Id.* at 372. This was so, the court held, notwithstanding circuit precedent that upheld Pittsburgh's 15-foot buffer zone just a few years earlier. *Id.* at 367–73 (distinguishing *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009)).

We do not regard *Bruni*'s approach as a viable option here. As we've noted, Chicago's bubble-zone ordinance is a carbon copy of the Colorado law upheld in *Hill* except for the smaller radius within which it applies. And *Hill*'s narrow-tailoring analysis was highly generalized; it did not rest on the specific facts of the case or an evaluation of Colorado's evidentiary showing. Accordingly, a remand for a case-specific narrow-tailoring analysis would effectively deny *Hill*'s controlling force.

It would also create a circuit split. In *Brown*, the predecessor case to *Bruni*, the Third Circuit upheld a separate provision in Pittsburgh's abortion-clinic law establishing an 8-foot no-approach bubble zone within a 100-foot radius of clinic entrances—"a virtually verbatim copy of the *Hill* statute"—without requiring a factual showing from the City. 586 F.3d at 273. *Bruni* left that part of *Brown* untouched.

*Hill* directly controls, notwithstanding its inconsistency with *McCullen* and *Reed*. Only the Supreme Court can bring harmony to these precedents. The district judge correctly dismissed the facial First Amendment challenge.

## D. Due-Process Vagueness Claim

In a cursory final argument, the plaintiffs maintain that Chicago's bubble-zone ordinance is unconstitutionally vague. This argument too is foreclosed by *Hill*, which rejected a vagueness challenge to Colorado's bubble-zone law. 530 U.S. at 732–33. The plaintiffs rely on Justice Kennedy's dissenting position: "In the context of a law imposing criminal penalties for pure speech, 'protest' is an imprecise word; 'counseling' is an imprecise word; 'education' is an imprecise word." *Id.* at 773 (Kennedy, J., dissenting). Perhaps he was right, but his view did not carry the day. The judge properly dismissed the due-process vagueness claim.

## III. Conclusion

The road the plaintiffs urge is not open to us in our hierarchical system. Chicago's bubble-zone ordinance is materially identical to—indeed, is narrower than—the law upheld in *Hill*. While the Supreme Court has deeply unsettled *Hill*, it has not overruled the decision. So it remains binding on us. The plaintiffs must seek relief in the High Court.

AFFIRMED.