In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 20-1621

SUSAN BENNETT,

*Plaintiff-Appellant,*

*v.*

COUNCIL 31 OF THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:19-cv-04087 — **Sara Darrow**, *Chief Judge.*

———————

ARGUED FEBRUARY 17, 2021 — DECIDED MARCH 12, 2021

———————

Before SYKES, *Chief Judge*, and FLAUM and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. When plaintiff–appellant Susan Bennett began working as a custodian for defendant–appellee Moline-Coal Valley School District (the "School District"), she had the choice either to become a member of defendants–appellees American Federation of State, County, and Municipal Employees ("AFSCME") Local 672 and AFSCME Council 31

(collectively, the "Union") and pay union dues or to decline membership yet pay "fair-share" or "agency" fees.[1] She chose to join the Union. Following the Supreme Court's decision in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), she notified the Union and the School District that she wished to resign her membership and terminate all payments to the Union. The Union allowed Bennett to resign her membership and opt out of payments, but only after the lapse of the window set forth in her union-membership agreement.

Bennett filed suit in federal district court, asserting that the deduction of union dues from her wages violated her rights under the First Amendment to the U.S. Constitution, as recognized in *Janus*. She also asserted that the Union's exclusive representation of her interests, even though she is no longer a member, violates her constitutional rights by allowing the Union to speak on her behalf. Bennett sought damages in an amount equal to the dues deducted from her paychecks up to the statute of limitations as well as various forms of declaratory and injunctive relief. The parties filed cross-motions for summary judgment, and the district court granted summary judgment in favor of all defendants–appellees. Bennett now appeals.

In a matter of first impression before this Court, Bennett cannot establish that the deduction from her wages of union dues she voluntarily agreed to pay in consideration for the benefits of union membership violated her First Amendment rights under *Janus*. Similarly, she cannot establish that *Janus*

---

[1] For simplicity, we use "fair-share fees" throughout to refer to these fees.

rendered the longstanding exclusive-bargaining-representative system of labor relations unconstitutional. We thus affirm the judgment of the district court.

## I.    Background

### A.  Statutory and Legal Background

The Illinois Educational Labor Relations Act ("IELRA" or the "Act"), 115 Ill. Comp. Stat. 5/1 *et seq.*, regulates labor relations between Illinois public-sector educational employers and employees. The Act provides public-sector educational employees with the right to choose to join a labor organization for purposes of representation. *Id.* § 5/3(a). A majority of employees in a bargaining unit may select a labor organization to serve as the unit's exclusive representative "with respect to wages, hours and other terms and conditions of employment." *See id.* §§ 5/8, 5/10(a). Employees need not become dues-paying members of a union that has been recognized as an exclusive representative, *id.* § 5/3(a), and a union recognized as an exclusive representative has the duty to represent all employees within the bargaining unit regardless of whether they are dues-paying members or not, *id.* § 5/3(b).

Prior to June 2018, a union certified as the representative of a bargaining unit could require nonmember employees to pay fair-share fees. *See id.* § 5/11. The Supreme Court ended that practice when it decided *Janus*. The Court in *Janus* held that the First Amendment prohibits unions and public employers from requiring public-sector employees to subsidize a union unless an employee affirmatively consents to waive that right. 138 S. Ct. at 2486. This "waiver must be freely given and shown by 'clear and compelling' evidence." *Id.* (quoting

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967) (plurality opinion))

### B.  Factual Background

Bennett began her employment as a custodian with the School District in August 2009. Under the terms of the IELRA, the Illinois Educational Labor Relations Board had certified the Union as the exclusive representative of her bargaining unit of custodial and maintenance employees. Bennett joined the Union in November 2009 by signing a membership and dues-deduction-authorization card that stated: "I hereby authorize my employer to deduct the amount as certified by the Union as the current rate of dues. This deduction is to be turned over to AFSCME, AFL-CIO." In August 2017, Bennett signed another membership and dues-deduction-authorization card that stated:

> I hereby affirm my membership in AFSCME Council 31, AFL-CIO and authorize AFSCME Council 31 to represent me as my exclusive representative on matters related to my employment.
>
> I recognize that my authorization of dues deductions, and the continuation of such authorization from one year to the next, is voluntary and not a condition of my employment.
>
> I hereby authorize my employer to deduct from my pay each pay period that amount that is equal to dues and to remit such amount monthly to AFSCME Council 31 ("Union"). This voluntary authorization and assignment shall be irrevocable for a period of one year from the

> date of authorization and shall automatically re-
> new from year to year unless I revoke this au-
> thorization by sending written notice … to my
> Employer and to the Union postmarked not
> more than 25 days and not less than 10 days be-
> fore the expiration of the yearly period de-
> scribed above, or as otherwise provided by law.

Therefore, as a condition of her most recent union membership agreement, Bennett authorized the School District to deduct union dues from her paychecks and remit that amount to the Union until August 21 during each authorized year. On that date, her authorization would automatically renew for the following year unless she revoked it. The membership agreement also contained a provision establishing a fifteen-day window in which Bennett could revoke her authorization and stop the withholding of union dues from her wages. *See* 5 Ill. Comp. Stat. 315/6(f) (requiring—if the exclusive representative and public employer agree on an automatically renewing one-year period of irrevocability for dues authorizations—a minimum of "an annual 10-day period" during which employees may revoke their dues-deduction authorizations); 115 Ill. Comp. Stat. 5/11.1(a) (same).

On November 1, 2018, after the Supreme Court issued its *Janus* decision, Bennett sent a letter to AFSCME's national office stating that she wanted to resign her union membership and asking the Union to stop collecting dues. On November 5, 2018, she wrote to the School District's chief financial officer, informing him that she intended to resign her union membership and requesting that the School District not honor any prior dues-deduction authorization she had signed. In their December 3, 2018 response, the School District told

Bennett to contact the Union regarding her inquiries, as the School District has no role, authority, or discretion in determining union membership or dues deductions. Ten days later, on or around December 13, 2018, the Union sent a letter to Bennett advising her that it would accept her resignation from membership as soon as it received written notice that she wanted to resign but, regardless of whether she resigned from the Union, she could not revoke her dues-deduction authorization until a two-week window from July 17 to August 11, 2019.

Bennett resigned her union membership on March 4, 2019, but the School District continued deducting union dues. On July 29, 2019, Bennett sent another letter to the School District requesting to revoke her dues-deduction authorization. The Union learned of that letter and treated it as an effective revocation of her dues-deduction authorization under the membership agreement. The School District thus stopped deducting union dues from Bennett's wages in August 2019.

### C. Procedural Background

While waiting for the arrival of her two-week revocation window, Bennett brought this action under 42 U.S.C. § 1983 and 28 U.S.C. § 2201(a) against the Union, the School District, and certain Illinois state officials (the "state defendants"). In Count I of the two-count complaint, Bennett alleged that the Union and the School District violated her First Amendment rights to free speech and freedom of association by deducting dues from her wages without her affirmative consent. She alleged that the dues-deduction authorizations she had signed prior to the issuance of the *Janus* decision did not provide affirmative consent because they were the product of an unconstitutional choice between paying full union dues or a fair-

share fee. As a remedy, Bennett sought damages from the Union in an amount equal to the dues deducted from her paychecks, both before and after *Janus* was decided. She also sought various forms of declaratory and injunctive relief against the Union and the School District. In Count II, brought against the Union and the state defendants, Bennett alleged that the system of exclusive representation set forth in the IELRA violates her free speech and associational rights. She sought a declaration that the Act is unconstitutional and injunctions barring its enforcement.

The state defendants moved to dismiss Count II under Federal Rule of Civil Procedure 12(b)(6). The remaining parties—Bennett, the Union, and the School District—submitted a joint stipulated record and filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56(a) as to both counts. The district court granted the Union's and the School District's motions for summary judgment, as well as the state defendants' motion to dismiss, and denied Bennett's motion for summary judgment. The court dismissed Bennett's action with prejudice, thus disposing of all claims against all parties.

This appeal followed.

## II.    Discussion

We review de novo dismissals under both Rule 12(b)(6) and Rule 56(a). *See Degroot v. Client Servs., Inc.*, 977 F.3d 656, 659 (7th Cir. 2020) (motion to dismiss); *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (summary judgment). Per the parties' agreement, the district court treated the state defendants' 12(b)(6) motion as one for summary judgment under Rule 56(a). Accordingly, we will review all motions on

appeal under the summary judgment standard. "Summary judgment is appropriate when there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law." *Est. of Jones v. Child.'s Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018). When, as here, the parties filed cross-motions for summary judgment, we construe all reasonable inferences in favor of the party against whom the motion was granted. *Gill v. Scholz*, 962 F.3d 360, 363 (7th Cir. 2020). Therefore, we will view the facts in the light most favorable to Bennett and draw all reasonable inferences in her favor.

## A. Deduction of Union Dues

Bennett first challenges the dismissal of Count I of her complaint, which alleged that the Union and the School District violated her First Amendment rights by deducting union dues from her paychecks. She does not dispute that she voluntarily authorized the deduction of dues or that she was not required to join the Union as a condition of employment. Nor does she dispute that she voluntarily signed the revised union-membership agreement in 2017. Instead, Bennett's appeal turns on the premise that the Supreme Court's *Janus* decision establishing the First Amendment right of public employees not to subsidize a union without first affirmatively consenting to waive that right applies to deduction of union dues. She contends that the district court erred because it did not apply *Janus*'s test for waiver, and under that test she did not waive her right. Bennett thus effectively argues that the *Janus* decision voided her dues-deduction authorization.

As the Union and the School District point out, however, the Ninth Circuit and a panel of the Third Circuit, as well as several district courts, have addressed this very argument

that *Janus*'s waiver requirement applies to union members as well as nonmembers and found it unavailing. Although not precedential here, the cases before the courts of appeals bear similarities to the case at hand. In the Third and Ninth Circuit cases, the plaintiffs were public employees who had, prior to *Janus*, signed union-membership agreements authorizing their state employers to deduct union dues from their paychecks. *See Fischer v. Governor of New Jersey*, No. 19-3914, 2021 WL 141609, at *1–2 (3d Cir. Jan. 15, 2021) (nonprecedential decision); *Belgau v. Inslee*, 975 F.3d 940, 945 (9th Cir. 2020), *petition for cert. docketed*, No. 20-1120 (U.S. Feb. 16, 2021). After the Supreme Court issued its *Janus* decision, each group of plaintiffs requested to resign their union memberships and terminate their payments. *See Fischer*, 2021 WL 141609, at *2; *Belgau*, 975 F.3d at 946. Their unions allowed the plaintiffs to resign, but their state employers continued to deduct dues from their paychecks until the terms of their dues-deduction authorizations expired as set forth in state law or the plaintiffs' membership agreements. *See Fischer*, 2021 WL 141609, at *2; *Belgau*, 975 F.3d at 946. The plaintiffs in each case sued their union and various state defendants, asserting that the defendants violated their First Amendment rights, as established in *Janus*, by collecting union dues from them without their consent and after they requested to terminate all such payments; by their formulation, *Janus* abrogated the commitments set forth in their membership agreements and required the state to obtain a constitutional waiver to deduct union dues from its employees' wages. *See Fischer*, 2021 WL 141609, at *3, *7; *Belgau*, 975 F.3d at 944, 950.

Both circuit court panels rejected the plaintiffs' *Janus* arguments. Relying on the Supreme Court's decision in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), they explained that

"[t]he First Amendment [did] not support [the plaintiffs']
right to renege on their promise to join and support the un-
ion" because that "promise was made in the context of a con-
tractual relationship between the union and its employees."
*Belgau*, 975 F.3d at 950. *See also Fischer*, 2021 WL 141609, at *8
n.18 ("[E]nforcement of Plaintiffs' membership agreements
does not violate the First Amendment given that those agree-
ments are enforceable under laws of general applicabil-
ity …."). Applying those First Amendment principles, the cir-
cuit court panels also agreed that "'*Janus* does not extend a
First Amendment right to avoid paying union dues' when
those dues arise out of a contractual commitment that was
signed before *Janus* was decided." *Fischer*, 2021 WL 141609, at
*8 (quoting *Belgau*, 975 F.3d at 951). Having determined that
the plaintiffs suffered no infringement upon their First
Amendment rights, the Third Circuit panel and the Ninth Cir-
cuit rejected the argument that *Janus* requires a constitutional
waiver before union dues are deducted. *See id.* at *8 n.18; *Bel-
gau*, 975 F.3d at 952. In reaching this holding, both panels
noted that they were joining a "swelling chorus of courts" rec-
ognizing that *Janus* did not create a new waiver requirement
for union members. *See Fischer*, 2021 WL 141609, at *8; *Belgau*,
975 F.3d at 951.

    We see no reason to disagree. The First Amendment "does
not confer … a constitutional right to disregard promises that
would otherwise be enforced under state law." *Cohen*,
501 U.S. at 672. Bennett authorized the deduction of union
dues as part of her membership agreement with the Union—
that is, "in the context of a contractual relationship." *See Bel-
gau*, 975 F.3d at 950. The Illinois common law of contracts is a
"law of general applicability" that applies broadly, rather
than targeting any individual, and does not offend the First

Amendment. *See Cohen*, 501 U.S. at 670. The First Amendment therefore does not, without more, render unenforceable any "legal obligations" or "restrictions that … are self-imposed" through a contract. *See id.* at 671.

Moreover, it is generally accepted that "the legal framework that existed at the time of a contract's execution must bear on its construction" and that "a subsequent change in the law cannot retrospectively alter the parties' agreement." *Fla. E. Coast Ry. Co. v. CSX Transp., Inc.*, 42 F.3d 1125, 1129–30 (7th Cir. 1994) (applying Florida law to settlement agreement). *See also* 11 Williston on Contracts § 30:23 (4th ed. 2020) ("[C]hanges in the law subsequent to the execution of a contract are not deemed to become part of [an] agreement unless its language clearly indicates such to have been [the] intention of [the] parties."). Rather, "[b]y binding oneself [by agreement,] one assumes the risk of future changes in circumstances in light of which one's bargain may prove to have been a bad one." *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005).[2] "That is the risk inherent in all contracts; they limit the parties' ability to take advantage of what may happen over the period in which the contract is in effect." *Id.* We see here no clear indication that the parties intended the terms of Bennett's membership agreements and dues-deduction authorizations to incorporate future changes in the law. Consequently, we agree with the reasoning of the Third and Ninth Circuit panels and conclude that the First Amendment does

---

[2] Although *Bownes* involved a plea agreement, we made explicitly clear that the analysis applied equally to contracts. *See* 405 F.3d at 636 ("In a contract (and equally in a plea agreement) one binds oneself to do something that someone else wants, in exchange for some benefit to oneself.").

not provide Bennett with a right to renege on her bargained-for commitment to pay union dues.

We also agree that *Janus* does not require a different result. In that case, the Supreme Court held that the practice of automatically deducting fair-share fees from nonmembers who "need not be asked" and "are not required to consent before the fees are deducted" violated those nonmembers' First Amendment rights by compelling them to subsidize the union's speech. *Janus*, 138 S. Ct. at 2460–61, 2486. In contrast, *Janus* said nothing about union members who, like Bennett, freely chose to join a union and voluntarily authorized the deduction of union dues, and who thus consented to subsidizing a union. While Bennett tries to decouple the decision to join the Union from the decision to pay union dues by framing the right at issue here as the "right to pay no money to the Union" (as she claims was recognized in *Janus*), she cannot do so: "By joining the union and receiving the benefits of membership, [Bennett] also agreed to bear the financial burden of membership." *Belgau*, 975 F.3d at 951. *See also Oliver v. Serv. Emps. Int'l Union Loc. 668*, 830 F. App'x 76, 79 n.3 (3d Cir. 2020) (nonprecedential decision) (explaining that one "cannot simultaneously choose to both join the Union and not pay union dues"); *Allen v. Ohio Civ. Serv. Emps. Ass'n AFSCME, Loc. 11*, No. 2:19-CV-3709, 2020 WL 1322051, at *8 (S.D. Ohio Mar. 20, 2020) ("By joining the union, Plaintiffs simultaneously acquired all of the benefits and burdens of membership."), *appeal dismissed*, Nos. 20-3440 & 20-3495, 2020 WL 4194952 (6th Cir. July 20, 2020).

Nothing in *Janus* suggests that its holding regarding union-related deductions from nonmembers' wages also applies to similar financial burdens on union members. The *Janus*

Court explicitly "dr[ew] the line at allowing the government to … require all employees to support the union." 138 S. Ct. at 2478. The Court also explicitly stated that "[s]tates can keep their labor-relations systems exactly as they are—only they cannot force nonmembers to subsidize public-sector unions." *Id.* at 2485 n.27. As we stated on remand in that case, the Court "was not concerned in the abstract with the deduction of money from employees' paychecks pursuant to an employ-ment contract." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31* ("*Janus II*"), 942 F.3d 352, 357 (7th Cir. 2019). Nor did it provide "an unqualified constitutional right to accept the benefits of union representation without paying." *Id.* at 358. Stated differently, "[t]he only right … recognized is that of an objector not to pay *any* union fees." *Id.*

In a last-ditch effort to evade this conclusion, Bennett ar-gues that *Janus*'s waiver requirement nonetheless applies to the deduction of union dues "[b]ecause all employees are nonmembers when they first sign a union membership card and authorize dues deductions." She seizes on language in *Ja-nus* stating that an employee's affirmative consent is required before "an agency fee [or] any other payment to the union may be deducted from a nonmember's wages," and that "[b]y agreeing to pay, nonmembers are waiving their First Amend-ment rights, and such a waiver cannot be presumed." *Janus*, 138 S. Ct. at 2486. She argues that the second part of this pas-sage must apply to employees in Bennett's position because, by definition, only union members have agreed to pay money to the union. In other words, she contends that it cannot apply to nonmember employees who have never agreed to pay the union and thus never waived their First Amendment rights.

Bennett, however, is not a nonmember as the term was used in *Janus*. Read as a whole, *Janus* distinguished between those who consented to join a union—as Bennett did—and those who did not. In the same passage on which Bennett relies, the Court made clear that a union may collect dues when an "employee affirmatively consents to pay." *Id.* As we explained above, Bennett voluntarily signed the membership agreements, which "authorize[d] [her] employer to deduct" her union dues and remit them to the Union. In August 2017, she also agreed that this authorization would remain in effect for the duration of her employment unless she validly revoked the authorization. Having consented to pay dues to the union, regardless of the status of her membership, Bennett does not fall within the sweep of *Janus*'s waiver requirement. *See Belgau*, 975 F.3d at 952 (explaining that *Janus* "in no way created a new First Amendment waiver requirement for union members before dues are deducted pursuant to a voluntary agreement"). Having determined that Bennett did not suffer a violation of her First Amendment rights, we conclude that the district court appropriately granted summary judgment for defendants–appellees as to Count I.

## B. Exclusive Representation

Bennett also appeals the dismissal of Count II of her complaint, which alleged that provisions in the IELRA providing for the Union's exclusive representation of her interests—even though she is no longer a member—violate her First Amendment free speech and associational rights. The First Amendment "forbids abridgment of the freedom of speech." *Janus*, 138 S. Ct. at 2463. It also "encompasses both the freedom to associate and the freedom *not* to associate." *Hill v. Serv. Emps. Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017) (citing

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012)). "Mandatory associations are subject to exacting scrutiny, meaning they require a compelling state interest that cannot be achieved through significantly less-restrictive means." *Id.* Bennett argues that the IELRA creates a mandatory association subject to heightened scrutiny. We agree with the district court that caselaw forecloses this argument.

In *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984), the Supreme Court rejected a First Amendment challenge to a Minnesota law that provided for exclusive-bargaining-unit representation for purposes of collective bargaining and on matters outside the scope of mandatory negotiations. *See id.* at 273–78. The Court held that the challenged law "in no way restrained [the employees'] freedom to speak … or their freedom to associate or not to associate with whom they please, including the exclusive representative." *Id.* at 288. The Court explained that the employees' free speech rights had not been infringed because the law did not deny nonunion members access to a public forum, and public employees had no right to be heard by, or negotiate individually with, their government employer. *See id.* at 280–83, 286–87. Similarly, the Minnesota law did not violate the employees' associational rights because they remained "free to form whatever advocacy groups they like" and were "not required to become members of [the union]." *Id.* at 289.

We followed *Knight* to uphold the constitutionality of the exclusive-bargaining-representative provisions of the Illinois Public Labor Relations Act—the parallel statute to the IELRA—in *Hill v. Service Employees International Union*. 850 F.3d at 864–66. In that case, a group of home healthcare and childcare providers argued that these provisions violated

their First Amendment associational rights because the statute forced them into a mandatory association with the union that represented their bargaining unit. *Id.* at 862–63. We held that the exclusive representation statute did not infringe on the plaintiffs' freedom of association because, as in *Knight*, the plaintiffs "do not need to join … or financially support" the union[3] and could form their own groups or oppose the union if they chose. *Id.* at 864. We further rejected the plaintiffs' argument that the law created a mandatory association triggering heightened scrutiny because the exclusive-representation system of labor relations did not compel them to express a particular message, accept undesired members into their own associations, or modify their expressive conduct. *Id.* at 865.

*Knight* and *Hill* control here to foreclose Bennett's claims based on the alleged infringement of her First Amendment free speech and associational rights. Bennett contends that exclusive representation creates a mandatory association subject to exacting scrutiny because it compels her to both associate with the Union and endorse speech that she finds objectionable. She further argues that exclusive representation under the IELRA does not meet that heightened standard because it does not serve a compelling state interest. As we did in *Hill*, we again reject these arguments against the constitutionality of exclusive representation.

Moreover, we find Bennett's attempts to distinguish *Knight* and *Hill* from this case unavailing. First, Bennett

---

[3] Although we decided *Hill* prior to *Janus*, at that time the Supreme Court had already struck down as unconstitutional the part of the Illinois Public Labor Relations Act that required the *Hill* plaintiffs to pay mandatory fees. *See Harris v. Quinn*, 573 U.S. 616, 656 (2014).

argues that *Knight* is distinct because it did not involve a compelled-representation challenge but addressed only whether the plaintiffs could force the government to listen to their views. We considered and rejected that argument in *Hill* because *Knight* acknowledged that exclusive bargaining required the state to treat the union representatives as expressing "the faculty's official collective position" even though "not every instructor agrees with the official faculty view on every policy question." *Knight*, 465 U.S. at 276. The *Knight* Court nonetheless concluded that this system of labor relations "in no way restrained appellees' freedom to speak … or their freedom to associate or not to associate with whom they please, including the exclusive representative." *Id.* at 288.

Second, Bennett asserts that *Hill* itself is distinct because the plaintiffs there were "partial" public employees—and their union thus had a limited ability to collectively bargain on their behalf. Accordingly, she argues that the *Hill* plaintiffs experienced a lesser degree of forced association than Bennett does as a "full-fledged" public employee. As explained above, however, we based our decision in *Hill* on *Knight*, which considered the exclusive representation of full public employees. *Compare Knight*, 465 U.S. at 275–76 (explaining that the Minnesota State Board for Community Colleges, the plaintiff faculty members' employer, operated and retained final policy-making authority over the state's community college system), *with Harris*, 573 U.S. at 621–23, 645–46 (describing plaintiff care providers as "partial," as opposed to "full-fledged," public employees because Illinois law established that private persons receiving homecare services are "employers" of and "control[] all aspects of the employment relationship" with care providers, while "the State's role is comparatively small").

We also disagree with Bennett's narrow reading of *Hill*; our reasoning in that case, rather than being specific to partial public employees, is equally applicable to Bennett because—like the *Hill* plaintiffs—she remains free to join or support a union and to associate or not associate with whomever she chooses. *See Hill*, 850 F.3d at 864–65. Nor must she modify her expressive conduct. *See id.* at 865. In any event, since *Hill*, we have stated that "*Knight* and its progeny firmly establish the constitutionality of exclusive representation" for full public employees. *Ocol v. Chi. Tchrs. Union*, 982 F.3d 529, 532 (7th Cir. 2020).

Finally, we remain unpersuaded by Bennett's argument in the alternative that *Janus* overturned *Knight* (and by extension *Hill*). She relies on a passage in *Janus* characterizing exclusive representation as "a significant impingement on associational freedoms that would not be tolerated in other contexts." 138 S. Ct. at 2478; *see also id.* at 2460 (explaining that exclusive representation "substantially restricts the rights of individual employees"). But *Janus* did not mention, let alone overrule, *Knight* or otherwise question the constitutionality of a system of labor relations based on exclusive representation. The same passage from *Janus* that Bennett relies on reaffirms that "[i]t is … not disputed that the State may require that a union serve as exclusive bargaining agent for its employees …. We simply draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views." *Id.* at 2478. After acknowledging this principle, the *Janus* Court concluded that "[s]tates can keep their labor-relations systems exactly as they are," other than charging fair-share fees. *Id.* at 2485 n.27.

In contrast, *Knight* speaks directly to the constitutionality of exclusive representation. "The [Supreme] Court's instructions in this situation are clear: 'If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case [that] directly controls, leaving to this Court the prerogative of overruling its own decisions.'" *Price v. City of Chicago*, 915 F.3d 1107, 1111 (7th Cir. 2019) (alteration in original) (quoting *Agostini v. Felton*, 521 U.S. 203, 237, (1997)). Consistent with that instruction, we apply *Knight*'s directly applicable precedent and hold that the IELRA's exclusive-bargaining-representative arrangement does not violate Bennett's First Amendment rights. We find further reinforcement for this conclusion in the fact that every circuit court to address this issue after the *Janus* decision has held that exclusive representation remains constitutional. *See Reisman v. Associated Facs. of Univ. of Me.*, 939 F.3d 409, 414 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 445 (2020); *Oliver*, 830 F. App'x at 80–81 (Third Circuit panel decision); *Akers v. Md. State Educ. Ass'n*, No. 19-1524, 2021 WL 852086, at *5 n.3 (4th Cir. Mar. 8, 2021); *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 813–14 (6th Cir. 2020), *petition for cert. docketed*, 20-1019 (U.S. Jan. 28, 2021); *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018); *Mentele v. Inslee*, 916 F.3d 783, 786–89 (9th Cir. 2019).

The district court thus appropriately granted summary judgment for defendants–appellees as to Count II.

### III.    Conclusion

Bennett cannot establish the existence of a First Amendment violation on either of the counts in her complaint. We therefore AFFIRM the district court's grant of summary

judgment for defendants–appellees and denial of summary judgment for Bennett.